# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 01-1048

_____

John Doe, a minor, by his mother       *
and next friend, Jane Doe,      *

     *

         Appellee,      *

     *      Appeal from the United States

       v.      *      District Court for the

     *      Eastern District of Arkansas.

Pulaski County Special School      *
District,      *      [PUBLISHED]

     *

         Appellant.      *

_____

Submitted: January 16, 2002
Filed: September 25, 2002

_____

Before WOLLMAN,[1] Chief Judge, HEANEY, McMILLIAN, BOWMAN, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, and RILEY, Circuit Judges, En banc.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002. He has been succeeded by the author of this opinion.

We granted en banc review to determine whether a school board ran afoul of a student's free speech rights when it expelled him for an offensive and vulgar letter that the student had prepared at home. The expelled student described in the letter how he would rape, sodomize, and murder a female classmate who had previously broken up with him. After a bench trial, the district court ordered the expelled student reinstated, concluding that the letter was not a "true threat" and that it therefore was protected speech under the First Amendment. A divided panel of our court affirmed the district court's decision. See Doe v. Pulaski County Special Sch. Dist., 263 F.3d 833 (8th Cir. 2001). We vacated the panel decision, ordered en banc rehearing, and now hold that the school board did not violate the student's First Amendment rights when it expelled him.

## I. BACKGROUND AND FACTS

J.M., a male, and K.G., a female, began "going together" during their seventh-grade year at Northwood Junior High School. As one would expect from typical junior high students, the two primarily saw each other at school and church, and their relationship was marked by multiple breakups during the school year. Sometime during the summer vacation after the end of the seventh-grade year, K.G. "broke up" with J.M. for the final time because she was interested in another boy.

Frustrated by the breakup and upset that K.G. would not go out with him again, J.M. drafted two violent, misogynic, and obscenity-laden rants expressing a desire to molest, rape, and murder K.G. According to J.M., he intended to write a rap song with lyrics similar in theme to the more vulgar and violent rap songs performed by controversial "rappers" such as Eminem, Juvenile, and Kid Rock, but found that his "song" fit no particular beat or rhythm. J.M. ultimately penned the documents as letters, signing them at their conclusion. J.M. prepared both letters at his home, where they remained until J.M.'s best friend, D.M., discovered one of them

2

approximately a month before the youths were to begin their eighth-grade year at Northwood.

D.M. found the letter in J.M.'s bedroom while he was searching for something on top of a dresser. Before D.M. had a chance to read the letter, J.M. snatched it from his hand. D.M. asked to read the letter, and J.M. handed it back to him and gave D.M. permission to read the letter. (Trial Tr. at 176-77; 300-02.) D.M. asked for a copy of the letter, but J.M. refused to give him one.

K.G. also learned about the existence and contents of the letter, but it was not made clear during the trial when or how she learned about it. K.G. testified that she first learned about a letter during a telephone conversation with J.M. She claimed that J.M. told her that another boy had written a letter that stated she would be killed. J.M. claimed instead that K.G. learned about the letter from D.M. Either way, the testimony clearly established that J.M. voluntarily discussed the letter with K.G. during two or three telephone conversations and that J.M. admitted to K.G. in their final telephone conversation that he, not another boy, had written the letter.

Concerned about the letter, K.G. enlisted D.M.'s help in obtaining it from J.M. About a week before the start of school, D.M. spent the night at J.M.'s house and took the letter from J.M.'s room on the following morning. D.M. did so without J.M.'s knowledge or permission. D.M. delivered the letter to K.G. on the second day back from summer vacation, and K.G. read it in gym class in the presence of some other students. One of those students went immediately to the school resource officer, Officer James Kesterson, and reported that threats had been made against K.G. Officer Kesterson accompanied the student back to the gym where he found K.G. frightened and crying. K.G. told Officer Kesterson that J.M. had threatened her and explained how she obtained the letter. Officer Kesterson conducted an investigation and informed school administrators about the situation.

3

Bob Allison, the principal, conducted his own investigation and learned that D.M. had taken the letter from J.M. and delivered it to K.G. at school. After the investigation, Principal Allison recommended that J.M. be expelled from Northwood for the remainder of his eighth-grade year. Allison based his recommendation on Rule 36 of the district's Handbook for Student Conduct and Discipline, which prohibits students from making terrorizing threats against others. The rule requires that a violator be recommended for expulsion.[2]

J.M. and his parents appealed the principal's recommendation to the Director of Student Services and Athletics, who serves as a hearing officer under the district's rules. The director recommended that J.M. be suspended from Northwood for one semester but that J.M. be allowed to attend the district's alternative school during the period of his suspension. J.M. appealed the director's decision to the school board. In the interim, he attended the alternative school from August 29 through September 12, the date of the school board's hearing on J.M.'s appeal. The school board voted at the conclusion of the hearing to expel J.M. from both Northwood and the alternative school for the remainder of his eighth-grade year, essentially adopting Principal Allison's initial recommendation.

---

[2]Rule 36 provides:

> Students shall not, with the purpose of terrorizing another person, threaten to cause death or serious physical injury or substantial property damage to another person or threaten physical injury to teachers or school employees. . . .

> Student[s] will be suspended immediately and recommended for expulsion.

(Appellant's App. of Trial Exs., Ex. 21.)

4

Upset with the school board's decision, J.M.'s mother filed this lawsuit on her son's behalf. J.M. sought reinstatement at Northwood on the ground that the school board violated his free speech rights when it disciplined him for the letter. On September 27, 2000, the district court issued a temporary restraining order, directing the board to reinstate J.M. on the condition that he have no contact with K.G. In November 2000, the district court held a bench trial on J.M.'s First Amendment claim and found in favor of J.M. The court concluded that the letter was not a true threat of violence, which may be punished without offending an individual's First Amendment rights, because J.M. had prepared the letter at home and did not intend to deliver it to K.G. The district court's judgment required the district to permanently reinstate J.M., to restore all rights and privileges he lost, and to remove from J.M.'s school records any reference to the expulsion.

## II. DISCUSSION AND ANALYSIS

### A. Mootness and Standard of Review

As a preliminary matter, J.M. argues that we no longer have jurisdiction because his First Amendment claim was rendered moot when he completed his eighth-grade year at Northwood. According to J.M., even if we reverse the district court's judgment, our decision will have no practical effect because he was expelled only for the remainder of his eighth-grade year, which he has completed. We agree that an appeal must be dismissed as moot when our decision will have no "effectual relief whatever to a prevailing party." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (internal quotations omitted). We disagree, however, that our decision can have no effect for either party and conclude that a live case or controversy remains between the parties.

In addition to reinstating J.M., the district court required the school board to expunge any mention of J.M.'s Rule 36 violation from his school records and ordered

it to restore all of J.M.'s rights and privileges. If we reverse the district court, the district will no longer be required to refrain from documenting the incident in J.M.'s school records. Cf. Kerr v. Farrey, 95 F.3d 472, 476 (7th Cir. 1996) (concluding that inmate's request to have disciplinary action expunged from his record was not rendered moot when inmate was paroled). Nor will the district be required to refrain from considering J.M.'s past rule violation in determining his present privileges as a student in the district; for instance, whether J.M. can be excluded from a class that K.G. is taking. Moreover, the district has a legitimate interest in a judicial determination of whether its application of the rule prohibiting terrorizing threats was constitutional because the district court's judgment implicates the district's ability to protect its students and staff. See Papish v. Bd. of Curators of the Univ. of Mo., 464 F.2d 136, 142 (8th Cir. 1972) (reasoning that an expelled student's constitutional challenge was not moot, based on the student's subsequent academic ineligibility, where the lawsuit weakened the University's ability to maintain regulatory measures benefitting its students), reversed and remanded on other grounds, 410 U.S. 667 (1973).

In reviewing a district court's judgment following a bench trial, we normally review the court's factual findings for clear error and its conclusions of law de novo. Speer v. City of Wynne, 276 F.3d 980, 984-85 (8th Cir. 2002). An appellate court's review, however, is unique in the context of a First Amendment claim. New York Times Co. v. Sullivan, 376 U.S. 254, 284-85 (1964). When such a claim is raised, we must "make an independent examination of the whole record . . . to assure . . . that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. at 285 (internal quotations omitted). Following a bench trial involving a First Amendment claim, an independent review of the facts is not necessarily a de novo review of all the facts relevant to the ultimate judgment entered. See Families Achieving Independence and Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1411 (8th Cir. 1997). Facts irrelevant to the free speech issue remain subject to the clear error standard, but we make a "fresh examination" of those facts

that are crucial to the First Amendment inquiry.  Id. (quoting Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston, 515 U.S. 557, 567 (1995)).  In doing so, we are not bound by the district court's witness-credibility determinations, yet we remain cognizant that the district court is in the best seat to observe the demeanor of the witnesses.  Id.

B. The True Threat Inquiry

As a general matter, the First Amendment prohibits governmental actors from directing what persons may see, read, speak, or hear.  Ashcroft v. The Free Speech Coalition, 122 S. Ct. 1389, 1399 (2002).  Free speech protections do not extend, however, to certain categories or modes of expression, such as obscenity, defamation, and fighting words.  R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83 (1992).  The government is permitted to regulate speech that falls within these categories because the speech is "'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'"  Id. at 382 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)).  Of course the rule remains that the government's proscription of speech within these categories may not, in general, be based on the content of the speech or the speaker's viewpoint.  Id. at 383-86.

In Watts v. United States, 394 U.S. 705 (1969), the Supreme Court recognized that threats of violence also fall within the realm of speech that the government can proscribe without offending the First Amendment.  Although there may be some political or social value associated with threatening words in some circumstances, the government has an overriding interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur."  R.A.V., 505 U.S. at 388.  Our task, therefore, is to determine "[w]hat is a threat . . . from what is constitutionally protected speech."  Watts, 394 U.S. at 707.  The Court in Watts, however, set forth no particular

definition or description of a true threat that distinguishes an unprotected threat from protected speech. Thus, the lower courts have been left to ascertain for themselves when a statement triggers the government's interest in preventing the disruption and fear of violence associated with a threat.

The federal courts of appeals that have announced a test to parse true threats from protected speech essentially fall into two camps. See United States v. Fulmer, 108 F.3d 1486, 1490-91 (1st Cir. 1997) (describing the differing circuit approaches to ascertaining a true threat). All the courts to have reached the issue have consistently adopted an objective test that focuses on whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm. See id. The views among the courts diverge, however, in determining from whose viewpoint the statement should be interpreted. Some ask whether a reasonable person standing in the shoes of the speaker would foresee that the recipient would perceive the statement as a threat, whereas others ask how a reasonable person standing in the recipient's shoes would view the alleged threat. Compare Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc), with United States v. Malik, 16 F.3d 45, 49 (2d Cir.), cert. denied, 513 U.S. 968 (1994).

Our court is in the camp that views the nature of the alleged threat from the viewpoint of a reasonable recipient. In United States v. Dinwiddie, we emphasized the fact intensive nature of the true threat inquiry and held that a court must view the relevant facts to determine "whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.'" 76 F.3d 913, 925 (8th Cir.) (quoting Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982)), cert. denied, 519 U.S. 1043 (1996); see also United States v. Hart, 212 F.3d 1067, 1071 (8th Cir. 2000) (quoting Dinwiddie's statement of what amounts to a true threat), cert. denied, 531 U.S. 1114 (2001). We also set forth in Dinwiddie a nonexhaustive list of factors relevant to how a reasonable

recipient would view the purported threat. Those factors include: 1) the reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence. Dinwiddie, 76 F.3d at 925.

In affirming the district court's conclusion that the letter constituted protected speech, our vacated panel opinion discussed Dinwiddie's factors but ultimately relied on the Ninth Circuit's definition of a true threat in Lovell v. Poway Unified Sch. Dist., 90 F.3d 367 (9th Cir. 1996). See Doe, 263 F.3d at 836-37. In Lovell, the Ninth Circuit explained that its test is "'whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.'" Lovell, 90 F.3d at 372 (quoting United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990)). Our panel reasoned that the Ninth Circuit, in focusing on whether a reasonable speaker would know of the threatening nature of his or her statement, provided the most concise standard to separate a true threat from protected speech. Doe, 263 F.3d at 837.

The panel's implicit rejection of the Dinwiddie true threat inquiry has some support. The First Circuit rejected the reasonable recipient approach, reasoning that it creates the peril that a speaker's constitutional rights could turn on a recipient's unique sensitivity or characteristic that is, or may be, unknown to the speaker. Fulmer, 108 F.3d at 1491. The notion underlying the First Circuit's decision is that the reasonable recipient test is less conducive to the robust and wide-open public debate envisioned by the First Amendment because a speaker may find it necessary to tone down his or her speech in fear of triggering a recipient's unknown sensitivity.

While a panel is normally bound to follow our circuit's prior panel decisions, we, as an en banc court, are free to overrule a prior decision or alter the law of our circuit when we determine such a course is necessary. Netland v. Hess & Clark, Inc., 284 F.3d 895, 899 (8th Cir. 2002). Given our panel's reliance on the reasonable speaker approach, and the First Circuit's criticism of the reasonable recipient approach, we find it appropriate to address whether we should adhere to the true threat inquiry we previously adopted in Dinwiddie. The debate over the approaches appears to us to be largely academic because in the vast majority of cases the outcome will be the same under both tests. The result will differ only in the extremely rare case when a recipient suffers from some unique sensitivity and that sensitivity is unknown to the speaker. Absent such a situation, a reasonably foreseeable response from the recipient and an actual reasonable response must, theoretically, be one and the same. We have come across no case where such a situation has ever been presented. Moreover, we find no overarching problem with our Dinwiddie approach because the recipient's reaction still must be a reasonable one even if he or she suffers some unique sensitivity, thus alleviating much of the First Circuit's concern. Finally, because neither party contends that one test or the other determines the outcome in this case, it is an inappropriate vehicle to use to alter our approach to ascertaining true threats. Accordingly, we adhere to Dinwiddie's inquiry and hold that a true threat is a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another.

## C. Intent to Communicate

Before we address whether a reasonable recipient would view the letter as a threat, we are faced with a threshold question of whether J.M. intended to communicate the purported threat. The district court's conclusion that the letter was protected speech turned on its finding that J.M. never intended to deliver the letter to K.G.; in other words, that J.M. never intended to communicate the purported threat to K.G. In determining whether a statement amounts to an unprotected threat, there

10

is no requirement that the speaker intended to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence. Planned Parenthood, 290 F.3d at 1075. However, the speaker must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it. Id. The requirement is satisfied if the speaker communicates the statement to the object of the purported threat or to a third party. See, e.g., United States v. Crews, 781 F.2d 826, 831-32 (10th Cir. 1986) (affirming conviction under 18 U.S.C. § 871 where a defendant made a statement to a third party that threatened to kill the President); Hawaii v. Chung, 862 P.2d 1063, 1071-73 (Haw. 1993) (recognizing that a defendant's statements to other teachers that he would kill the principal were true threats entitled to no First Amendment protection).

Requiring less than an intent to communicate the purported threat would run afoul of the notion that an individual's most protected right is to be free from governmental interference in the sanctity of his home and in the sanctity of his own personal thoughts. See Stanley v. Georgia, 394 U.S. 557, 564-68 (1969) (recognizing an individual's right under the First Amendment to possess obscene material in the privacy of one's home). In Stanley, the Supreme Court recognized that the First Amendment means, at a minimum, that the government has no business telling an individual what he may read or view in the privacy of his own home. Id. at 565. The government similarly has no valid interest in the contents of a writing that a person, such as J.M., might prepare in the confines of his own bedroom. After all, "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control" the moral contents of our minds. Id. It is only when a threatening idea or thought is communicated that the government's interest in alleviating the fear of violence and disruption associated with a threat engages.

We conclude here that J.M. intended to communicate the letter and is therefore accountable if a reasonable recipient would have viewed the letter as a threat.

11

Although J.M. snatched the letter out of D.M.'s hands when D.M. first found it, J.M. handed the letter back to D.M. and permitted D.M. to read it. J.M.'s decision to let D.M. read the letter is even more problematic for J.M. given his testimony that he knew there was a good possibility that D.M. would tell K.G. about the letter because D.M. and K.G. were friends. (Trial Tr. at 178.) J.M. also discussed the letter in more than one phone conversation with K.G., and J.M. admitted to K.G. that he wrote the letter and that it talked of killing her. J.M. made similar admissions to K.G.'s best friend who would be likely to convey the information to K.G. (Trial Tr. at 174-75.) One can hardly say, based on J.M.'s willingness to let D.M. read the letter and his overt discussion of the letter and its contents with K.G. and K.G.'s best friend, that J.M. intended to keep the letter, and the message it contained, within his own lockbox of personal privacy.

D. Reasonable Recipient's Perception of the Letter

We turn next to the question of whether a reasonable recipient would have perceived the letter as a threat. There is no question that the contents of the letter itself expressed an intent to harm K.G., and we disagree entirely, but respectfully, with the district court's assessment that the words contained in it were only "arguably" threatening. The letter exhibited J.M.'s pronounced, contemptuous and depraved hate for K.G. J.M. referred to or described K.G. as a "bitch," "slut," "ass," and a "whore" over 80 times in only four pages. He used the f-word no fewer than ninety times and spoke frequently in the letter of his wish to sodomize, rape, and kill K.G. The most disturbing aspect of the letter, however, is J.M.'s warning in two passages, expressed in unconditional terms, that K.G. should not go to sleep because he would be lying under her bed waiting to kill her with a knife.[3] Most, if not all,

_____

[3]J.M. argues it would have been improbable for him to harm K.G. in the manner he described because K.G. resided with her parents. However, a threat does not need to be logical or based in reality before the government may punish someone for making it. See United States v. Bellrichard, 994 F.2d 1318, 1322 (8th Cir.), cert.

12

normal thirteen-year-old girls (and probably most reasonable adults) would be frightened by the message and tone of J.M.'s letter and would fear for their physical well-being if they received the same letter. Cf. Jones v. Arkansas, 64 S.W.3d 728, 736 (Ark. 2002) (concluding that a rap song that described the murder of a fifteen-year-old female student and her family, which was written by a male student and delivered to the female student, was a true threat).

The fact that J.M. did not personally deliver the letter to K.G. did not dispel its threatening nature. Although J.M. did not personally hand the letter to K.G., J.M. titled the letter "F___ that bitch [K.G.]," and he wrote the letter as though he was speaking directly to her. As a consequence, the letter was extremely intimate and personal, and the violence described in it was directed unequivocally at K.G. Cf. Bellrichard, 994 F.2d at 1321 (recognizing that correspondence directed to one's home or work is more likely to be perceived as a threat than a general statement delivered at a public gathering).

There is also no indication that J.M. ever attempted to alleviate K.G.'s concerns about the letter during the period between when he told her about the letter and when she received it at school. Prior to K.G. obtaining the letter, J.M. had discussed its contents with her in phone conversations, and he testified at trial that he knew K.G. might have taken the threat as being truthful. It readily appears that J.M. wanted K.G. to be scared as retribution for her treatment of him. In fact, K.G.'s best friend testified at trial that J.M. told her, before D.M. obtained the letter and delivered it, that J.M. wanted to hide under K.G.'s bed and kill her. J.M. told this to K.G.'s best friend knowing the friend would likely pass the message along to K.G. (Trial Tr. at 239-41). J.M. also shared the letter with D.M. suspecting that D.M. would pass the information

denied, 510 U.S. 928 (1993); see also Planned Parenthood, 290 F.3d at 1075 (stating there is no requirement that the speaker be able to carry out the threat). It seems quite probable that the threat to hide under a person's bed with a knife would induce fear and apprehension.

13

it contained to K.G. J.M. ultimately apologized to K.G., but his apology came only after he was expelled by the school board and during the pendency of the district court proceeding. The crescendoing events that presaged K.G.'s receipt of the actual letter would not have given a reasonable person in K.G.'s shoes much solace that J.M. did not want or intend to harm her.

Based on the tone of the letter, and the situation surrounding its communication, we are not surprised that those who read it interpreted it as a threat. Watts, 394 U.S. at 708 (recognizing the reaction of the listener is relevant to whether the speech is protected). D.M. was concerned enough by the letter that he purloined it from his friend's home because he "felt that something should be done about it." (Trial Tr. at 302.) A girl present when K.G. first read the letter immediately went to Officer Kesterson because she thought someone needed to know about the letter and the threats contained therein. School officials conducted an investigation and ultimately instituted expulsion proceedings because they believed the letter amounted to a "terrorizing threat."[4] As for K.G., she broke down crying and was scared to leave the gym after she read the letter. She also slept with the lights on for the first couple of nights after the incident. The junior high principal who observed K.G. shortly after K.G. received the letter described K.G. as being extremely frightened. He explained that K.G. remained frightened enough of J.M. that she went home early when J.M. returned to school after the district court temporarily reinstated him.

J.M.'s previous portrayal of himself as a tough guy with a propensity for aggression made his threat more credible and contributed to K.G.'s reaction. Before the breakup, J.M. had told K.G., as well as K.G.'s best friend and D.M., that he was a member of the "Bloods" gang. (Trial Tr. at 243, 259-60, 299). K.G. also testified

---

[4]We find it untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of J.M.'s letter would not have taken some action based on its violent and disturbing content.

14

at trial that J.M. once shot a cat while she was speaking to him on the phone and that J.M.'s penchant for violence towards animals heightened her concern over the letter. (Trial Tr. at 262-63.) The district court excluded the district's evidence of J.M.'s violent propensities on the ground that the evidence was not considered by the school board. We conclude, however, that the evidence is relevant to an understanding of K.G.'s response to the threat and our determination of whether her response was a reasonable one. See Families Achieving Independence, 111 F.3d at 1411 ("[I]n cases involving the First Amendment, appellate courts must make an independent examination of the whole record to ensure that its judgment does not constitute a forbidden intrusion on the field of free expression." (internal quotations omitted)).

Viewing the entire factual circumstances surrounding the letter, we conclude that a reasonable recipient would have perceived J.M.'s letter as a serious expression of an intent to harm K.G. As such, the letter amounted to a true threat, and the school's administrators and the school board did not violate J.M.'s First Amendment rights by initiating disciplinary action based on the letter's threatening content. The district court's contrary conclusion was erroneous. Had we been sitting as the school board, we might very well have approached the situation differently, for it appears to us that the board's action taken against J.M. was unnecessarily harsh. Other options have occurred to us that could have furthered the district's interest in protecting its students, as well as have punished J.M., but also have aided him in understanding the severity and inappropriateness of his conduct. However, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." Wood v. Strickland, 420 U.S. 308, 326 (1975). Those judgments are best left to the voters who elect the school board.

## III. CONCLUSION

We reverse the judgment of the district court and remand the case to the district court with instructions to dissolve the injunctive relief afforded J.M. and to dismiss J.M.'s First Amendment claim against the school district.

HEANEY, Circuit Judge, with whom McMILLIAN, MORRIS SHEPPARD ARNOLD, and BYE, Circuit Judges, join, dissenting.

Because I believe the majority has undermined the scope of the First Amendment by failing to consider the unique circumstances of speech in a school setting, I respectfully dissent. I believe the proper inquiry before us is 1) whether J.M.'s written expression is protected speech or a true threat; and 2) if it is protected speech, as I believe it is, whether it is subject to regulation because it may cause substantial disruption or interfere with the rights of other students. The majority ignores the school context analysis and creates dangerously broad precedent by holding that <u>any</u> private utterance of an intent to injure another person is not entitled to First Amendment protection. I reject this reasoning because it violates the fundamental principles of the First Amendment. I would hold instead that J.M.'s written expression is constitutionally protected speech, but can be <u>reasonably</u> regulated by school administrators to prevent substantial disruption in the school setting.

I.      True Threat Analysis

I agree with the majority that in the Eighth Circuit, a true threat is a statement that a reasonable recipient would interpret as a serious expression of an intent to harm or cause injury to another. I disagree, however, with the majority's rejection of the district court's determination that J.M. had not communicated a true threat to K.G. The district court's factual findings do not constitute "a forbidden intrusion on the field of free expression," nor are they clearly erroneous. The majority ignores the

16

district court's findings to conclude that J.M. intended to communicate a threat to D.M., and that a reasonable recipient of J.M.'s letter understood the letter to be a threat. This holding cannot be independently supported by the record. I would therefore affirm the district court.

United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996) sets forth the standard for determining whether speech constitutes a true threat. The majority recites this standard, but omits analysis of how that standard is applied. Judge Richard Arnold explained in that well-reasoned opinion that "[t]he court must analyze an alleged threat 'in the light of [its] entire factual context,' . . . and decide whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.'" (quoting United States v. Lee, 6 F.3d 1297,1306 (en banc) (Lay, J., concurring in part and dissenting in part); Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982)). The court in Dinwiddie relied on the following facts to conclude that the speaker had issued a true threat:

> Mrs. Dinwiddie made these statements not once or twice, but about 50 times. She communicated them directly [with a bullhorn] to Dr. Crist, who reacted to them by wearing a bullet-proof vest. Finally, Dr. Crist was aware that Mrs. Dinwiddie, a well-known advocate of the view that it is justifiable to use lethal force against doctors who perform abortions, had attacked . . . a Maintenance Supervisor at Planned Parenthood, physically obstructed potential patients who were trying to enter Planned Parenthood, . . . and told . . . Planned Parenthood's Executive Director, "Patty, you have not seen violence yet until you see what we do to you." These facts gave Dr. Crist reason to believe that Mrs. Dinwiddie had a propensity to use force.

Dinwiddie, 76 F.3d at 925-26. There is no question that her series of communications to Dr. Christ amounted to a true threat.

It is unclear how the majority could conclude that the facts before us rise to the level of a <u>Dinwiddie</u> true threat, given the entire factual context of J.M.'s written expression. During summer vacation, J.M., a fourteen-year-old recipient of a certificate of honor from the Greater Jonesboro Chamber of Commerce, and a student in good academic standing with a record of good behavior, wrote a vile letter that suggested he would rape, sodomize, and murder his ex-girlfriend, K.G. He placed the letter on his bureau or shelf in his bedroom, and apparently forgot about it.[5] Weeks, if not months,[6] later, a friend, D.M., discovered the letter on the shelf, and after protest, J.M. let D.M. read it. K.G. was informed of the contents of the letter before she saw it, but did not seek help from adults. J.M. discovered on the second day of his eighth-grade year that upon K.G.'s request, and to gain K.G.'s favor, D.M. had stolen the letter from his room and shown it to K.G., who reported him to school authorities. K.G. was frightened by the message and slept with the lights for three nights, but was otherwise calm. A police report was filed, but the county attorney did not press charges, and J.M. apologized to and hugged the girl and her mother at the church they attend together before the school board voted to expel him.[7] J.M. and K.G. continue to attend school together, without incident. This entire context must

_____

[5]In the record there are two copies of the writing at issue. To an untrained eye, the handwriting in one copy is different from the other, suggesting that someone other than J.M. copied the contents of his letter. Neither party raises that issue, so we do nothing more than note the difference in handwriting here.

[6]The record fails to provide clear dates about when J.M. wrote the letter and when D.M. discovered it. J.M.'s father stated at the September 12, 2000 School Board Meeting that the letter sat in J.M's room for two months before D.M. read it. Transcript of School Board Meeting, App. of Trial Exhibits, Ex. 6 at 16.

[7]J.M. explained at the September 12, 2000 School Board Meeting that on September 10, 2000, he approached K.G. and her mother at church to apologize: "I told her mom and [K.G.] that I was sorry for all this stuff that had happened. And then her mom hugged me and then [K.G.] hugged me." Transcript of School Board Meeting, App. of Trial Exhibits, Ex. 6 at 33.

be considered in determining whether J.M. intended to communicate the threat and whether a reasonable person in K.G.'s position would consider the letter a true threat.

II.     Intent to Communicate

The majority concludes on the basis of the facts recited above that J.M. intentionally or knowingly communicated a threat to K.G. by allowing D.M. to read the letter. The majority correctly notes that there must be some intent to communicate a threat, yet the majority unreasonably stretches facts and law to find that J.M. had the requisite intent to do so. Whether J.M. meant to communicate a threat is a finding of fact that should be reviewed under a clearly erroneous standard. The district court's conclusion that J.M. lacked the necessary intent is supported by the evidence. J.M. never intended anyone to see his letter. He wrote it in the privacy of his bedroom and placed it on his shelf away from the eyes of others. When D.M. found the letter, J.M. immediately grabbed it from him, indicating that he did not want to publicize his private writings. J.M. gave in and unwisely allowed D.M. to read it, but he refused to let D.M. have a copy of the letter. Furthermore, D.M. had to steal the letter to deliver it to K.G. J.M. never gave D.M. his permission to show the letter to anyone. D.M. understood at all times that the letter was never meant for K.G.'s viewing. I reject the majority's conclusion that J.M. intended to communicate the letter.

Rather than defer to the district court's reasonable factual findings on the matter, the majority attempts to turn the issue into a legal question. I disagree with the majority's conclusion that J.M.'s acquiescence to D.M.'s request to see the letter amounts to the communication of a threat. The cited legal authority fails to support the proposition that J.M.'s actions constitute an intent to communicate. The court cites United States v. Crews, 781 F.2d 826 (10th Cir. 1986), and a decade-old Hawaii Supreme Court case, State v. Chung, 862 P.2d 1063 (Haw. 1993), for the proposition that the alleged threatening communication need only be conveyed to a third party to rise to the level of a true threat. These cases lend little insight to the inquiry before

19

us. Crews informs us of the special security concerns related to threats on the President's life, even when the threat never reaches the President's ears. The case involves a psychiatric ward patient who, after taking a large dose of anti-depressant medication, told a nurse that he would shoot President Reagan if he came to the hospital, an unlikely visit. Id. at 829. The court concluded he had issued a true threat. Yet, unlike the situation here, a federal statue specifically prohibits making threats against the President to anyone, precluding any sort of analysis of the context within which the statement was made. See 18 U.S.C. § 871 (1976); see also United States v. Welch, 745 F.2d 614, 615-16, 620 (10th Cir. 1984) (holding that man with minimal brain dysfunction who blamed President Reagan for unavailability of vocational training and stated that if President Reagan were in town he would get a rifle and shoot him, had issued a true threat); but see Watts v. United States, 394 U.S. 705, 706, 708 (1969) (holding that protester's public statement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers," constituted political hyperbole, not a true threat). The Crews analysis of a threat against the President is inapplicable to the situation before us, which involves a teenage gossip-circle about a break-up, not the specifically prohibited threatened assassination of our national leader.

Chung also fails to shed light on our analysis of J.M.'s letter, and, in any case, we are not bound to follow Hawaiian precedent. In that case, a teacher with a history of mental illness told four co-workers that he intended to kill the principal. Chung, 862 P.2d at 1067-68. On school grounds he showed each teacher the gun or ammunition he planned to use to carry out his plan. Id. He had a months-long strained relationship with the principal, he violated his ten-day administrative leave by being on campus, he brought a semiautomatic pistol to school, and he initiated conversations with others to tell them about his plan. The teachers believed he could carry out the threat. In contrast, J.M. never initiated discussion about the contents of the letter to anyone, he was not a known disciplinary problem at his school, he did not possess weapons, he participated in church activities with K.G. throughout the

summer, and he had civil conversations with her even after she knew about the contents of the letter. Furthermore, J.M. did not intend to convey a plan to harm K.G. when he let D.M. read the letter. The majority's reliance on the Chung holding is misguided.

The facts in Roberts v. State, CA 01-1496, 2002 WL 1376178 (Ark. App. June 26, 2002), are more closely aligned with the facts before us. Roberts holds that in some circumstances, third-party knowledge of an alleged threat it is not enough to constitute a true threat. In that case, a seventh-grader wrote a "Hit List (To Shoot List)" in his notebook during music class. The teacher regularly collected the students' notebooks to assess their class work. When she noticed that Roberts was not engaged in the lesson, she picked up his notebook and saw the "Hit List" heading on the page and nineteen names underneath the heading, at least one of which belonged to a student she knew. Although Roberts allowed his teacher to read his list, it was unlikely that he gave his consent voluntarily. The court held that there was insufficient evidence to conclude that the list had been written with the purpose of terrorizing another pursuant to Ark. Code Ann. § 5-13-301 (Repl.1997)[8] and explained, "[w]hile it is clear that the statute does not require that the threat be communicated directly to the person threatened, the gravamen of the offense is the communication, not utterance." Id. at *2 (citation omitted). The court concluded that the statute did not "impose criminal liability for threats made in reckless disregard of the risk causing the terror." Id. Roberts recognizes that third-party knowledge of the contents of an alleged threat against another is not enough to conclude that a true threat has been issued. Although our court is not bound to follow this case, I believe it accurately and reasonably sets forth the analysis we should follow when reviewing an alleged intent to communicate a threat.

---

[8]The statute prohibits any communication uttered "with the purpose of terrorizing another person," where the speaker "threatens to cause death or serious physical injury or substantial property damage to another person."

III. Reasonable Response

Even if we were to conclude that J.M. intended to communicate the letter to D.M., a reasonable recipient in K.G.'s position would not have viewed the letter as a threat.[9]  The majority finds that a reasonable recipient would perceive the letter as a threat because of the contents of the letter; because J.M. acknowledged that he had written the letter; because K.G. was upset and slept with the lights on; and because J.M. told K.G. that he had shot a cat and was a member of the Bloods.  I address each of these concerns separately.

Admittedly, the content of the letter is chilling.  At its core, however, the letter is expression that was never intended to be communicated to K.G.; it was a private response to his break-up.  Furthermore, the record shows that K.G. knew that J.M. did not want her to see the letter.  The record demonstrates that, regrettably, J.M. thought Eminem's lyrics were the best source of inspiration for his catharsis.  Today's teenagers witness, experience, and hear violence on television, in music, in movies, in video games, and for some, in abusive relationships at home.  It is hardly surprising that such violence is reflected in the way they express themselves and communicate with their peers, particularly where adult supervision is lacking.  The shocking contents of the letter alone, however, do not warrant the finding of a true threat.  As Dinwiddie notes, the entire context must be considered.  "When a threat is not communicated nor intended to be communicated to the object of the statement, . . . some further evidence that the individual has done more than think evil thoughts ought to be shown.  Proof of actual intent to carry out the threat is needed to demonstrate the reality of the threat itself.  Any other rule vests far too much power

_____

[9]I note here that there is some confusion in the majority's opinion about who is a reasonable recipient.  The majority finds an intent to communicate the threat to D.M., but then considers the effect of the threat from a reasonable person's perspective in K.G.'s shoes.

in the government at the expense of the individual." <u>United States v. Crews</u>, 781 F.2d 826, 837 (10th Cir. 1986) (Logan, J., dissenting).

J.M.'s admission that he wrote the letter is inconclusive as well. Once his social circle knew about the contents of the letter, he denied authorship of it, allowing one to conclude that he was embarrassed he had written it. He later admitted to having written the letter, but nothing in the record indicates that he did more than acknowledge that he had written awful things about K.G. He never issued verbal threats against K.G. during their multiple phone conversations over the course of the summer, nor did he ever affirm his intentions to carry out the actions described in the letter.

K.G.'s response is certainly relevant to the inquiry, though it is not determinative because the objective standard in our inquiry requires consideration of the reasonable recipient's response. Given the entire context, it was unreasonable for K.G. to believe that the letter was a true threat. Although K.G. felt shocked and scared by the contents of the letter, the record reveals that J.M. never directly communicated a threat to her. Over at least a two-month period, K.G. heard about the letter before it was brought to school; initiated conversations with J.M. and others about the contents of the letter; told her friend to steal the letter from J.M.'s room; continued to participate in youth group activities with J.M., even after he admitted that he had written violent things about her; and after having read the letter months after it was written, reportedly slept with the lights on. She also hugged J.M. after he apologized for his conduct. Although she knew who wrote the disturbing contents of the letter before it was brought to school, she did not alert a parent, a Sunday school teacher, or other adult about her concern. Rather, she solicited information and the letter itself through her friends as part of what appears to be a complicated tangle of teenage networking. Although a reasonable person would naturally be shocked by the contents of the letter, it is unreasonable for K.G. to have concluded that her life

was in danger. She knew that J.M. did not want her to see the letter and that they had interacted in a non-violent manner at all times of their acquaintance.

Had J.M. had a criminal record, or handed the letter to her directly, or previously expressed an intent to hurt her, it would be far easier to conclude that K.G. reasonably believed that J.M. intended impose harm. Those are not the facts of this case. K.G. and her friends had to work hard to obtain a copy of the letter, indicating J.M.'s reluctance to make it a public issue. I therefore would not conclude that her response was reasonable.

Finally, the majority relies on J.M.'s reputation in concluding that a reasonable recipient could conclude that he had issued a threat. K.G. testified that she thought J.M. had killed a cat and remembered that J.M. had boasted that he, a white kid from rural Arkansas, was a member of the Bloods. This amounts to teenage bravado at best, and does not warrant serious consideration by this court.

A comparison of this case and others in which our circuit has found a true threat demonstrates how far the majority stretches the law today. In concluding that J.M.'s letter constitutes a true threat, the majority has placed this boy in the company of the following cast of characters: a pro-life advocate who physically assaulted an employee at Planned Parenthood and, over a period of a year, warned a doctor with the aid of a blow horn nearly fifty times that he should remember Dr. Gunn, the doctor who was murdered because he performed abortions, United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996); three teenage boys who burned three crosses in the yards of African American families, United States v. J.H.H., 22 F.3d 821 (8th Cir. 1994); a convicted murderer who sent a judge a letter informing him that he will "see you in hell before I permit you to [revoke custody of my son]," Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982); an anti-abortion activist who parked and left unattended two Ryder trucks in the entrance driveways of two Little Rock abortion clinics after the Oklahoma City bombing, causing the evacuation of

the area and the call for a bomb squad investigation, <u>United States v. Hart</u>, 212 F.3d 1067 (8th Cir. 2000); a man charged with bombing a building and who sent twenty-three letters to the home and work addresses of judges and government workers, threatening to kill them, <u>United States v. Bellrichard</u>, 994 F.2d 1318 (8th Cir. 1993). J.M.'s conduct does not resemble the acts of these criminals. He wrote a disturbing but private letter that was not intended to be viewed by anyone. It would be a great injustice to conclude that his writings rise to the level of a true threat: there was no communication of a true threat, nor could there have been a reasonable belief that he intended to carry out the actions in the letter.

IV.    School Board Action

Because I would find that J.M.'s letter is not a true threat and is entitled to First Amendment protection, I next examine whether the school board acted reasonably in regulating J.M.'s speech. A fundamental principle underlying the freedom of speech is that the government may not censor the expression of an idea simply because the government or society finds it offensive or disagreeable. <u>See</u> <u>Texas v. Johnson</u>, 491 U.S. 397 (1989). Freedom of speech is preserved in our nation's schools, but the exercise of speech rights is not absolute in the educational context. Although censorship of student speech is presumptively invalid, it can be prohibited to prevent potentially disruptive conduct. <u>See</u> 3 JAMES A. RAPP, EDUCATION LAW § 9.04 (2001).

In the context of political expression on school campuses, the Supreme Court has held that students may express their opinion on controversial subjects, provided such expression is accomplished without materially and substantially interfering with disciplinary objectives in the operation of the school. <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 512-13 (1969). "[C]onduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion

of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513.

With regard to the use of profane language in student speeches, Bethel School District No. 403 v. Fraser, 478 U.S. 675, 676, 683 (1986), informs us that it is "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse;" and that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." Tinker and Fraser establish that language that would normally be considered protected speech may be regulated in a school setting to prevent disruptive student conduct. School administrators have a duty to ensure that students are educated in a safe environment, and this safety may come at the cost of limited student speech rights. See Lisa M. Pisciotta, *Beyond Sticks and Stones: A First Amendment Framework for Educators Who Seek to Punish Student Threats*, 30 Seton Hall. L. Rev. 635 (2000).

The majority acknowledges that the school board's expulsion of J.M. and the elimination of the option to attend the alternative school in the district was unnecessarily harsh, yet it defers to the board's discretion. While I agree that we should not interfere with school board decision-making where it has acted constitutionally, we are obliged to impose our judgment where there has been an abuse of discretion, as in this case. "The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." Id. (citing Epperson v. Arkansas, 393 U.S. 97, 104 (1968); Tinker, 393 U.S. at 507) (emphasis added). "Despite this considerable discretion, courts have recognized that school boards must exercise their powers 'in a manner that comports with the transcendent imperatives of the First Amendment.'" Stark v. Indep. Sch. Dist. No. 640, 123 F.3d

1068, 1073 (8th Cir. 1997) (quoting Edwards v. Aguillard, 482 U.S. 578, 583-84 (1987)(citation omitted)). "While this court must ordinarily defer to the judgment of a body vested with such powers, we are not so obligated when the exercise of the power constitutes an abuse of discretion." Bowman v. Pulaski County Special Sch. Dist., 723 F.2d 640, 645 (8th Cir. 1983).

The school board failed to exercise sound, reasonable, and legal decision-making in its review of J.M.'s conduct. On August 23, 2000, Principal Allison recommended that J.M. be expelled for the year. Recommendation for Expulsion Notice, App. of Trial Exhibits, Ex. 3. Sometime after that date but before the September 12 school board hearing, Dr. Welch of the Pupil Personnel Committee recommended that J.M. attend Alpha Academy, the alternative school in the district, for a semester with the possibility of returning to Northwood Junior High for the second semester, contingent upon good behavior while at Alpha. Transcript of Meeting with Director of Pupil Discipline, App. of Trial Exhibits, Ex. 5 at 8. Dr. Welch reasoned, "I do not want to see Josh on the street and out of school because of what Mr. Calhoun has told me, that I think basically he's a good kid." Id. at 9. Dr. Welch informed the family that if they were unhappy with his decision they could appeal to the school board, which they opted to do.

Before the school board hearing began, it appears the board had concluded that J.M. had issued a "terroristic threat" without actually considering whether the letter was written with the purpose of terrorizing another person, as required by case law and its own Rule 36. While it would be unreasonable for a body of non-attorneys to conduct the complex true threat analysis that this court attempts today, it is an abuse of discretion for the board to exclude a reasoned analysis of its rule as applied to the context of the case before it.

The hearing took place at 10 p.m. J.M., J.M.'s parents, Mr. Allison, Assistant Principal Calhoun, and Dr. Welch testified. Rather than acting as a neutral decision-

making body and allowing J.M. to explain his side of the story, the board devoted the first part of the meeting to convincing J.M's family that Alpha Academy was a decent place and that J.M. would probably benefit from his experience there. From that point, several board members took the opportunity to chastise J.M. and his family for not asking K.G. to be at the meeting, and for allowing their son to listen to rap music. Transcript of School Board Meeting, App. of Trial Exhibits, ex. 6 at 23, 42. One board member made sweeping generalizations of J.M.'s frame of mind: "[I] understand how teenage boys can react at that age, but this goes beyond that. This goes beyond a level that – quite frankly, it scares the begeebees out of me . . . . [T]his shows terrible, terrible problems taking place in a person's mind, whether he got it off of tapes or not, whether he was listening to Eminen or other rap stars." Id. at 29. At another point, board member O'Brien claimed to know a menace when he sees one: "This scares me. We've had kids in here who I've expelled or we've done whatever, I've never been scared to be in their presence. I looked into your eyes a minute ago, I've practiced criminal law for five years, you weren't looking back at me. There wasn't anything in your eyes. There wasn't any remorse. That scares me." Id. at 44.

Concerned that J.M. did not understand the severity of expulsion, O'Brien demanded, "[y]ou don't know what it means to be expelled, do you?" Id. at 45. Unsatisfied with J.M.'s response, O'Brien provided the "correct" answer: "[t]o maybe not have a life. You may have a problem getting into other school districts, you may never finish school. Your life may now be over. Do you get that?" Id. To provide J.M. with questionable context regarding the severity of his transgression, O'Brien stated, "[k]id, I tell you, I want to help you, but this is scary stuff. It's not [as though] you slapped some girl's rear end, you know." Id. Finally, another board member assured J.M. that "in a court of law this would be treated more seriously than terroristic threatening. It's a threat of serious physical injury or property damage." Id. at 48-49. Apparently not realizing that the county attorney had decided not to

28

press charges against J.M., the board member wanted to make sure that there was a police report taken.  Id. at 49.

A motion was made to impose expulsion against J.M., and after a 5-2 vote in favor of expulsion was taken, the board remained uncertain as to whether they had expelled him for a semester or the entire year, and whether J.M. would be allowed to attend Alpha Academy.  They voted again, and decided to expel J.M. for the year without the option of attending the alternative school.  Whereas J.M.'s family thought they were appealing Dr. Welch's recommended semester expulsion from Northwood with the option of attending Alpha Academy, they left the meeting with a far more stringent punishment imposed against J.M.  When J.M's father expressed concern about this, Ms. Cherven, who appeared to have allowed a family member's experience with threatening conduct sway her decision, exclaimed, "[n]ow, sir, what did you expect us to do?  I mean, in all honesty, when you decided to appeal to the school board, you didn't want to accept Dr. Welch's recommendation, did you think that we were just going to put your child back in school? Is that what you thought?"  Id. at 64.

The board's draconian punishment is unprecedented among the school threat cases across the nation.  Consider these: a fifteen year old student who exclaimed to a counselor that she was so angry she "could just shoot someone," or "[i]f you don't give me this schedule change, I'm going to shoot you," was suspended for three days, Lovell v. Poway Unified School District, 90 F.3d 367, 369 (9th Cir. 1996); an adjudicated delinquent who wrote a rap song that threatened his female friend's life and which he handed to her at school, was sentenced to 24 months supervised probation and seven days in a juvenile detention facility, but was allowed to attend school, Jones v. State, 64 S.W.3d 728, 732 (Ark. 2002); a seventh-grader who was placed on nine months probation and ordered to complete forty hours of community service for writing a "hit list" at school, discovered by his teacher, but whose case

was dismissed and order vacated by appellate court because there was insufficient evidence to find a true threat, Roberts, 2002 WL 1376178 at *1.

There is something fundamentally wrong with our system of justice if we willingly revoke a non-offending teenager's privilege to attend public school, particularly where an alternative school is available, and where the responsible school authority recommended the alternative school as a constructive way to handle the matter. J.M., of all people, belongs in school. It does not pass unnoticed by this court that teachers and administrators in today's world are expected to undertake greater responsibilities than what the one-room schoolhouse teacher shouldered. Educators serve as surrogate parents, psychologists, social workers, and security guards, above and beyond their normal teaching responsibilities. They are charged with the duties of creating a safe learning environment, teaching clear communication, and protecting students' constitutional rights. It is clear that we as parents, neighbors, members of religious communities, political leaders, and members of the court cannot alienate teachers and administrators as they grapple with issues of violence in the classroom. It is not acceptable, however, to lower the bar for what constitutes a true threat and expel a "good kid" with a good scholastic record when other remedies are available. Nor should J.M. be more severely punished than what was originally recommended because he exercised his right to appeal Dr. Welch's decision to the school board.

Because I believe that J.M.'s written expression was protected speech, I would affirm the district court's holding that J.M. had not issued a true threat. Although I agree that J.M.'s conduct required disciplinary action, the school board's response was an abuse of discretion. I would therefore affirm the district court.

McMILLIAN, Circuit Judge, dissenting.

I join Judge Heaney's dissenting opinion and also write separately because I believe, first, that J.M.'s statement made in the privacy of his home was protected speech. That statement was not a true threat.

In addition, and of equal importance, I question whether the school had any legitimate authority over such a statement, made in the privacy of his home, not at school or during school hours or using school equipment, which was stolen from his home by one of his friends, at the request of another, and then turned over to school officials. If anything, the statement was arguably a police matter, for which, I note, the local prosecuting attorney refused to issue any charges.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.