*282 JAMES L. DENNIS, Circuit Judge:
This appeal raises a First Amendment challenge to a public high school student’s suspension- and transfer to alternative school for his off-campus posting on the Internet of a rap song criticizing, with vulgar and violent lyrics, two named male athletic coaches for sexually harassing female students at his school. The aspiring student rapper, Taylor Bell, composed'the song off campus, recorded it at a professional studio unaffiliated with the school, and posted it on his Facebook page and on YouTube using his personal computer while at home. Bell had never before been charged with a serious school disciplinary violation. After the disciplinary action was imposed and affirmed by the Itawamba County School Board, Bell and his mother, Dora Bell, sued the School Board, its Superintendent, and the school’s Principal, for violation of Bell’s freedom of speech under the First Amendment and Dora Bell’s substantive-due-process right to parental authority under the Fourteenth Amendment. Upon cross-motions for summary judgment, the district court rendered summary judgment for the School Board and its officials. The Bells appealed.
We reverse the district court’s judgment in favor of the School Board against Taylor Bell and render summary judgment against the School Board in favor of Taylor Bell, awarding him nominal damages as prayed for, and other relief, for the Board’s violation of his First Amendment right to freedom of speech. The summary-judgment evidence and materials establish that .Bell composed and recorded his rap song completely off campus; that he used his home computer to post it on the Internet during non-school hours; and that the School Board did not demonstrate that Bell’s song caused a substantial disruption of school work or discipline, or that school officials reasonably could have fore-casted such a disruption. Otherwise, the district court’s grant of summary judgment in favor of Defendants-Appellees against Dora Bell is affirmed, as well as the district court’s summary judgment for the individual school officials.[1]
I.
A.
In December 2010, Taylor Bell was an eighteen-year-old senior at Itawamba Agricultural High School with no record of any disciplinary problem aside from a single in-school suspension for tardiness. Bell is an aspiring rap[2] musician, has written lyrics and music since he was a young *283 boy, and began recording and seriously pursuing music in his early teens.[3] In this respect, Bell considers himself an “artist.” Bell testified that several of his female friends at school told him before Christmas 2010 that two male athletic coaches at school, Michael Wildmon and Chris Rai-ney, had inappropriately touched them and made sexually-charged comments to them and other female students at school. The record also contains affidavits from female students stating that they informed Bell of this misconduct by Wildmon and Rainey. According to these affidavits, Wildmon told one of Bell’s classmates, R.M.,[4] that she had a “big butt” and that he would date her if she were older. She also stated that Wildmon had looked down her shirt, inappropriately touched her, and told her that she was “one of the cutest black female students” at Itawamba. Another student, D.S., told Bell that she witnessed these incidents between Wildmon and R.M.; in addition, D.S. informed Bell that Rainey had “rubbed [her] ears at school without her permission, and [that she] had to tell him to stop.” Yet another student, S.S., told Bell that Rainey commented to her that he thought she had “‘messed’ with some nasty people” and suggested that he otherwise would have, in S.S.’s words, “turn[ed] [her] back ‘straight’ from being ‘gay.’ ” A fourth student, K.G., told Bell that Rainey approached her in the gym and said, “damn baby, you are sexy.”
Bell admitted that he did not report these complaints to school authorities, but he explained that, in his view, the school officials generally ignored complaints by students about the conduct of teachers and coaches. During the Christmas holidays, while school was not in session, Bell composed and recorded a rap song about the female students’ complaints at a professional recording studio unaffiliated with the school. Bell did not use any school resources in creating or recording the song. According to Bell, he believed that if he wrote and sang about the incidents, somebody would listen to his music and that it might help remedy the problem of teacher-on-student sexual harassment.
The song[5] accused Wildmon of telling students that they are “sexy” and looking down female students’ shirts, and it stated that he “better watch [his] back,” and that “white dude, guess you got a thing for them yellow bones / looking down girls shirts / drool running down your mouth / you fucking with the wrong one / gonna get a pistol down your mouth.” The refrain of the song repeated lines to the effect of “middle fingers up if you hate that nigga / middle fingers up if you can’t stand that nigga / middle fingers up if you want to cap that nigga.” The song referred to Rainey as a second “Bobby Hill,” a former Itawamba football coach who was arrested and accused of sending explicit text messages to a minor in 2009. The lyrics also accused Rainey of “rubbing black girls’ ears in the gym.” The song’s lyrics in full were as follows:[6]
*284 Let me tell you a little story about these Itawamba coaches
Dirty ass niggas like some fucking coa-cha roaches
Started fucking with the whites and now they fucking with the blacks
That pussy ass nigga Wildmon got me turned up the fucking max.[7]
Fucking with the students and he just had a baby
Ever since I met that cracker I knew that he was crazy
Always talking shit cause he know I’m from the city[8]
The reason he fucking around cause his wife ain’t got no titties
This nigga telling students that they sexy, betta watch your back
I’m a serve this nigga like I serve the junkies with some crack
Quit the damn basketball team / The coach a pervert
Can’t stand the truth so to you these lyrics going to hurt[9]
What the hell was they thinking when they hired Mr. Rainey
Dreadlock Bobby Hill the second / He the same see
Talking about you could have went pro to the NFL
Now you just another pervert coach, fat as hell[10]
Talking about you gangsta / Drive your mama’s PT Cruiser[11]
Run up on T-Bizzle[12] / I’m going to hit you with my rueger[13]
Think you got some game / Cuz you fucking with some juveniles
You know this shit the truth so don’t you try to hide it now
Rubbing on the black girls’ ears in the gym
White hoes, change your voice when you talk to them
I’m a dope runner, spot a junkie a mile away
Came to football practice high, remember that day
I do, to me you a fool nigga
30 years old fucking with students at the school
Hahahah You’s a lame and it’s a damn shame
Instead you was lame, eat shit, the whole school got a ring mutherfueker.[14]
Heard you textin’[15] number 25[16] / You want to get it on
White dude, guess you got a thing for them yellow bones
Looking down girls’ shirts / Drool running down your mouth
*285 You fucking with the wrong one / Going to get a pistol down your mouth/Pow[17]
OMG[18] took some girls in the locker room in PE
Cut off the lights you motherfucking freak
Fucking with the youngins Because your pimpin game weak[19] How he get the head coach I don’t really fucking know
But I still got a lot of love for my nigga Joe
And my nigga Makaveli and my nigga Cody
Wildemon talk shit bitch don’t even know me
Middle fingers up if you hate that nigga
Middle fingers up if you can’t stand that nigga
Middle fingers up if you want to cap that nigga
Middle fingers up / he get no mercy nigga.
In the first few days of January 2011,[20] Bell uploaded the song to his profile on Facebook using his private computer during non-school hours. On Facebook, the song was accessible to Bell’s pre-approved online “friends.”[21] The Facebook website was blocked on school computers. Although any of Bell’s Facebook “friends” potentially could use a cellphone to access the song on Facebook, school regulations prohibited students from bringing cellphones to school.
Upon returning to. school after the Christmas holidays, Bell testified that he never encouraged anyone at school — students or staff — to listen to the song. He further testified that he never played the song at school. No evidence was offered by the School Board to the contrary.
On January 6, 2011, Wildmon received a text message inquiring about the song from his wife, who had been informed of Bell’s Facebook posting by a friend. In *286 response to Wildmon’s inquiry, a student allowed him to listen to the song on the student’s cellphone. Wildmon immediately reported it to the Principal, Trae Wiygul, who, in turn, informed Teresa McNeece, the Superintendent.
The next day, Wiygul, McNeece, and the school district’s, attorney, Michele Floyd, questioned Bell about the song and its accusations. According to McNeece, she asked whether Bell meant that the teachers were having sexual relations with students, to which Bell responded that the lyrics meant the teachers were “messing with kids” — not having sexual relations with them. Bell testified, somewhat differently, that he told the school officials that “everything [he] said in the song was true.” According to Bell, the school officials never suggested that Wildmon or Rainey felt threatened; instead, it seemed to Bell, the problem was that Wildmon felt as though “his name had been slandered.” Bell testified that the officials never said that school had been disrupted as a result of the song. After speaking with McNeece and the other officials, Bell was sent home for the rest of that day, which was a Friday. Bell testified that he was not given a clear answer as to the specific reason why he was being sent home that day.
Due to snow, the school was closed until Friday of the following week. During that time, Bell created a more polished version of the song,[22] which included various sound effects, a slideshow,[23] and a brief monologue at the conclusion. In this monologue, Bell explained the genesis of his song:
A lot of people been asking me lately you know what was my reasoning behind creating P.S. Roaches. It’s ... something that’s been going on ... for a long time [ ] that I just felt like I needed to address. I’m an artist ... I speak real life experience.... The way I look at it, one day, I’m going to have a child. If something like this was going on with my child ... it’d be ‘4:30.’[24] ... That’s just how it is ...
Bell then uploaded the final version of the song to YouTube from his home computer before classes resumed. Bell later explained that he created and posted this YouTube version of the song to help people, including school officials, “more clearly understand exactly what [he] was saying” in the song.
When school resumed on the following Friday, Bell returned to school. He testified that he could discern no disruption due to the song, nor did he tell anyone at school — students or staff — to listen to the song. However, around mid-day on that date, he was removed from class by the Assistant Principal, who informed him that he was suspended effective immediately, pending a disciplinary hearing. However, school officials did not require Bell to immediately vacate the school, and he remained in the school commons until his school bus arrived at day’s end.
B.
At the disciplinary/due process hearing before the school’s Disciplinary Committee on January 26, 2011, the school district’s attorney, Michele Floyd, stated that the purpose of the hearing was to determine *287 whether Bell had “threatened], intimi-dat[ed], and/or harass[ed] one or more school teachers.”[25] Bell and his mother, Dora Bell, were present and were represented by counsel. At the beginning of the hearing, Principal Wiygul presented a brief summary of the events leading up to the disciplinary hearing. The Committee then listened to the YouTube version of the song.
Bell was asked why he composed, recorded, and posted the song. He explained that he had written the rap song in response to the coaches’ inappropriate behavior toward female students. He testified that he did not believe that telling the school authorities about the coaches’ misconduct would have accomplished anything because school officials had failed to respond to other students’ complaints in the past.[26] During the hearing, Bell presented letters from female students corroborating the allegations of the coaches’ misconduct. The Committee stated that the Board was concerned about the coaches’ possible misconduct and would investigate those allegations, but it explained that those allegations were not relevant to Bell’s hearing.
The Committee also questioned Bell about his intentions with respect to the song and whether the violent lyrics reflected an intention to harm the coaches. Bell conveyed that the song was a form of artistic expression meant to reflect his real-life experiences[27] and to increase awareness of the situation. Bell explained that the lyrics were not intended to intimidate, threaten, or harass Wildmon or Rai-ney. However, he indicated that the lyrics did reflect the possibility that a parent or relative of one of the female students might eventually react violently upon learning that the coaches were harassing their children — not that Bell would react violently.[28] Bell explained that he uploaded the remastered version of the song to YouTube because he wanted people to “clearly understand” his intentions with respect to the song and that the YouTube version was more targeted at record labels than the Facebook version. He also ex *288 plained that he did not tell anyone to listen to the song at school.
At the disciplinary/due process hearing, no evidence was presented that the song had caused or had been forecasted to cause a material or substantial disruption to the school’s work or discipline. In addition, there was no evidence presented indicating that any student or staff had listened to the song on the school campus, aside from the single instance when Wild-mon had a student play the song for him on his cellphone in violation of school rules. Neither of the coaches named in the song attended or testified at the hearing, and no evidence was presented at the hearing that the coaches themselves perceived the song as an actual threat or disruption.
At the very end of the hearing, one of the Committee members provided the following admonition to Bell: “I would say censor your material.... Because you are good [at rapping], but everybody doesn’t really listen to that kind of stuff. So, if you want to get [] your message out to everybody, make it where everybody will listen to it.... You know what I’m saying? Censor that stuff. Don’t put all those bad words in it.... The bad words ain’t making it better ... Sometimes you can make emotions with big words, not bad words. You know what I’m saying? ... Big words, not bad words. Think about that when you write your next piece.”[29]
The next day, Floyd sent Bell’s mother a letter setting forth the Committee’s decision to uphold the suspension already imposed on Bell, to place Bell in an alternative school for the remainder of the nine-week grading period, and to prohibit Bell from attending any school functions during that time. The letter stated that the Committee had concluded that whether Bell’s song constituted a “threat to school district officials was vague.”[30] But the Committee did find that the song harassed and intimidated the coaches in violation of Itawamba School Board policy[31] -and unspecified state law.
The School Board affirmed the Disciplinary Committee’s decision on February 7, 2011, which was memorialized in a letter sent to Dora Bell from Floyd on February 11, 2011. In that letter, Floyd stated: “As you are aware, [the Board] determined that Taylor Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State *289 Law.”[32] The Board did not assign any additional reasons for its decision.
C
Taylor and Dora Bell filed this civil action under 42 U.S.C. § 1983 on February 24, 2011, in the • United States District Court for the Northern District of Mississippi against the Itawamba County School Board, Superintendent McNeece (individually and in her official capacity), and Principal Wiygul (individually and in his official capacity), alleging that the defendants violated Taylor Bell’s First Amendment right to freedom of speech by imposing school discipline on Bell for his off-campus composition, recording and Internet-posting of his rap song.[33] Bell sought nominal damages and injunctive relief ordering reinstatement of his school privileges, ex-pungement from his school records of all references to the incident, and prevention of the defendants from enforcing the school disciplinary code against students for expression that takes place outside of the school or school-sponsored activities, as well as attorneys’ fees and costs.
On March 10, 2011, the district court held a hearing on the preliminary-injunction motion. At the hearing, a number of different witnesses testified, including the two coaches named in the song. Rainey testified that he had not heard the song and felt it was “just a rap,” not to be taken seriously, and that he felt that if he “let it go, it [would] probably just die down.” However, he stated that the song had “affected” the way he “talk[ed] to kids,” leading him to avoid interactions with students that might be interpreted as being inappropriate. For example, he indicated that he felt the song had affected his ability to act like a “parent figure” to students. He also testified that students had begun spending more time in the gym since the posting of the song, but he could not confirm this was a result of Bell’s song. Rai-ney further testified that most of the talk amongst students has been about Bell’s suspension and transfer to alternative school.
Wildmon testified that the song caused him to be more cautious around students and to avoid the appearance that he was behaving inappropriately toward them.[34] He further testified that students around him “seem[ed] to act normal” after the song was published to the Internet. Wild-mon said that he took the lyrics “literally” *290 and that he felt “scared” after hearing the song since “you never know in today’s society ... what somebody means, how they mean it.” In this regard, Wildmon testified that, after hearing the song, he would not let his players leave basketball games until after he was in his vehicle. In addition, Wildmon denied ever texting “a girl, like No. 25, on the basketball team,” as referenced in the song’s lyrics. Otherwise, there is no indication that either party questioned the coaches about the truth or falsity of the female students’ allegations.
At the conclusion of the hearing, the district court denied the motion for the preliminary injunction as moot because Bell had only one day of alternative school remaining. Thereafter, following the parties’ filing of cross-motions for summary judgment, the district court granted summary judgment in favor of the Defendants. The court concluded that, pursuant to Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the song’s lyrics “in fact caused a material and/or substantial disruption at school and that it was reasonably foreseeable to school officials the song would cause such .a disruption.” Specifically, the court stated that Wildmon’s and Rainey’s testimony that the song “adversely affected” their teaching styles constituted an “actual disruption” to school activities. The court also concluded that it was “reasonably foreseeable” that the song, which “levies charges of serious sexual misconduct against two teachers using vulgar and threatening language and ... is published on Facebook.com to at least 1,300 ‘friends’ ... and the unlimited internet audience on YouTube.com, would cause a material and substantial disruption at school.” The Bells timely appealed.
II.
We review a district court’s grant of summary judgment de novo, applying the same standard as the district court. See Mesa v. Prejean, 543 F.3d 264, 269 (5th Cir.2008). “[Sjummary judgment is proper ‘if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.’ ” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). “When parties file cross-motions for summary judgment, ‘we review each party’s motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.’ ” Duval v. Northern Assur. Co. of Am., 722 F.3d 300, 303 (5th Cir.2013) (quoting Ford Motor Co. v. Tex. Dept. of Transp., 264 F.3d 493, 498 (5th Cir.2001)).
III.
The principal issue presented by this case is whether a public high school violated the First Amendment by punishing a student for his off-campus speech, viz., his rap song posted on the Internet that criticized two male coaches for their improper conduct toward minor female students. This case does not involve speech that took place on school property or during a school-approved event off campus. Nevertheless, the district court, interpreting Tinker v. Des Moines Independent Community School District as applying directly to students’ off-campus speech, as well as their on-campus speech, held that the School Board had authority to regulate and punish Bell’s speech because the evidence established that his rap song had “in fact” substantially disrupted the school’s work and discipline and that it was “rea *291 sonably foreseeable” that the song would cause such a disruption. 859 F.Supp.2d 834, 840 (N.D.Miss.2012). We reverse the district court’s application of Tinker as legally incorrect, and conclude that Tinker could not afford the School Board a defense in this case because the summary-judgment evidence and materials do not support the conclusion that a material and substantial disruption at school actually occurred or reasonably could have been fore-casted.
Contrary to the district court’s conclusions, id. at 837-38, the Supreme Court’s “student-speech” cases, including Tinker, do not address students’ speech that occurs off campus and not at a school-approved event. The Court has not decided whether, or, if so, under what circumstances, a public school may regulate students’ online, off-campus speech, and it is not necessary or appropriate for us to anticipate such a decision here. Even if Tinker were applicable to the instant case, the evidence does not support the conclusion, as required by Tinker, that Bell’s Internet-posted song substantially disrupted the school’s work and discipline or that school officials reasonably could have fore-casted that it would do so. Moreover, we reject the School Board’s alternative argument that the plainly rhetorical use of violent language contained in Bell’s song falls within this court’s narrow holding in Ponce v. Socorro Independent School District, 508 F.3d 765 (5th Cir.2007), that student speech threatening a Columbine-style mass school shooting was not protected by the First Amendment. Furthermore, in light of the rap’s factual context, its lyrics’ conditional nature, and the reactions of its listeners, we likewise reject the argument that Bell’s rap song was excepted from First Amendment protections because it constituted a “true threat.”
A.
“That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions.” Shanley v. Northeast Indep. Sch. Dist., 462 F.2d 960, 967 (5th Cir.1972). Nevertheless, this court “laid to rest” more than a half century ago “the notion that state authorities could subject students at public-supported educational institutions to whatever conditions the state wished.” See id. (citing Dixon v. Ala. State Bd. of Educ., 294 F.2d 150 (5th Cir.1961)). “And of paramount importance is the constitutional imperative that school boards abide constitutional precepts: ‘The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures — Boards of Education not excepted.’ ” Id. (citing West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). Thus, “[t]he authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards,” including the dictates of the First Amendment. See Goss v. Lopez, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).
Because speech is often provocative and challenging, and may strike at prejudices and preconceptions and have profoundly unsettling effects as it presses for the acceptance of an idea or cause, the First Amendment protects speech against restriction or punishment by the government. Cox v. Lousiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); see also Texas v. Johnson, 491 U.S. 397, 408-10, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); Hustler Magazine v. Falwell, 485 U.S. 46, 54-57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); Cohen v. California, 403 U.S. *292 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In Tinker, the Supreme Court considered whether the First Amendment’s protections against government censorship apply to student speech inside public schools. The Court recognized that students do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,” but also observed that those rights must be calibrated “in light of the special characteristics of the school environment.” 393 U.S. at 506-07, 89 S.Ct. 733. To reconcile these competing interests, the Court fashioned a rule that has become the touchstone for assessing the scope of students’ on-campus First Amendment rights ever since: while on campus, a student is free to “express his opinions, even on controversial subjects, if he does so without ‘materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school’ and without colliding with the rights of others.” Id. at 513, 89 S.Ct. 733 (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966)). However, speech by the student that “materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.” Id. at 513, 89 S.Ct. 733.
Therefore, under Tinker, school officials may prohibit student speech and expression upon showing “facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school activities.” Id. at 514, 89 S.Ct. 733. School officials “must be able to show that [their] action[s] [were] caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.” Id. at 509, 89 S.Ct. 733. It is a school’s burden to prove that its suppression of student speech conforms with this governing standard.[35] Id. at 511-14, 89 S.Ct. 733; see also Shanley, 462 F.2d at 969 (“When the constitutionality of a school regulation is questioned, it is settled law that the burden of justifying the regulation falls upon the school board.”).
This court has further elaborated on Tinker’s substantial-disruption standard. “Although school officials may prohibit speech based on a forecast that the prohibited speech will lead to a material disruption, the proscription cannot be based on the officials’ mere expectation that the speech will cause such a disruption.” AM. ex rel. McAllum v. Cash, 585 F.3d 214, 221 (5th Cir.2009). Further, school officials “must base their decisions ‘on fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe.’ ” Id. at 221-22 (quoting Butts v. Dallas Indep. Sch. Dist., 436 F.2d 728, 731 (5th Cir.1971)); see also Butts, 436 F.2d at 732 (“[T]here must be some inquiry, and establishment of substantial fact, to buttress the determination.”); Shanley, 462 F.2d at 970 (“[T]he board cannot rely on ipse dixit to demon *293 strate the ‘material and substantial’ interference with school discipline.”).
Since Tinker, the Supreme Court has recognized that, even if on-campus speech or speech at school-approved events is non-disruptive within the meaning of Tinker, school officials may restrict that speech in a limited set of circumstances: if it is lewd or vulgar, Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), if it is school-sponsored and the restriction is “reasonably related to legitimate pedagogical concerns,” Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), or if it is reasonably viewed as promoting the use of illegal drugs, Morse v. Frederick, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). However, in all of these cases, the speech at issue occurred on campus or at a school-approved event where the school’s conduct rules expressly applied. Moreover, members of the Court have taken great pains to emphasize that these exceptions to the Tinker “substantial-disruption” test are narrowly confined and do not provide school officials with broad authority to invoke the “special characteristics of the school environment” in order to circumvent their burden of satisfying the Tinker test in factual scenarios that do not fit within the exceptions to Tinker established by Fraser, Hazelwood, and Morse. See, e.g., Morse, 551 U.S. at 422-23, 127 S.Ct. 2618 (Alito, J., concurring) (“I join the opinion of the Court on the understanding that (1) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (2) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as ‘the wisdom of the war on drugs or of legalizing marijuana for medicinal use.’ ”) (internal citation omitted).
Contrary to the district court’s conclusion,[36] the Supreme Court in Tinker did not hold that the “substantial-disruption” test applies to off-campus speech. Instead, when the Court.stated that, “[a] student’s rights ... do not embrace merely the classroom hours” and that, “conduct by the student, in class or out of it, which ... materially disrupts ... is, of course, not immunized by the constitutional guarantee of freedom of speech [,]” Tinker, 393 U.S. at 512-13, 89 S.Ct. 733, the Court was simply indicating that the delicate balance between the protection of free speech rights and the regulation of student conduct extends to all facets of on-campus student speech and not just that occurring within the classroom walls. Accordingly, the Court further stated, “When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without ‘materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school’ and without colliding with the rights of others.” Id. (internal citation omitted). When read in context, the Tinker Court did not intend that its holding would allow a public school to regulate students’ freedom of speech at home and off campus.[37] Rather, the Court *294 meant that the governing analysis would apply “in class or out of’ the classroom while the student is on campus during authorized hours. The Court’s subsequent student speech cases make this distinction clear. See Hazelwood, 484 U.S. at 266, 108 S.Ct. 562.[38]
*295 In the instant case, the School Board may not assert Tinker as a defense because, even assuming arguendo that the Tinker “substantial-disruption” test could be applied to a student’s off-campus speech,[39] the summary-judgment evidence establishes that no substantial disruption ever occurred, nor does it “demonstrate *296 any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.” Tinker, 393 U.S. at 514, 89 S.Ct. 733. Viewing the evidence in the light most favorable to the School Board, there was no commotion, boisterous conduct, interruption of classes, or any lack of order,' discipline and decorum at the school, as a result of Bell’s posting of his song on the Internet. Cf. Shanley, 462 F.2d at 970 (“Disruption in fact is an important element for evaluating the reasonableness of a regulation screening or punishing student expression.”). Indeed, the School Board’s inability to point to any evidence in the record of a disruption directly undermines its argument and the district court’s conclusion that the summary-judgment evidence supports a finding that a substantial disruption occurred or reasonably could have been forecasted. At the preliminary injunction hearing, Wildmon explained that his students “seem[ed] to act normal” after the posting of the song, and Rainey testified that most of the talk amongst students had not been about Bell’s song but rather about his suspension and transfer to alternative school. ’ No evidence was offered that Bell or any other student listened to the song on campus, aside from the single instance when Wildmon had a student play the song for him on his cellphone. The only particularized evidence[40] of a purported disruption that the defendants or the district court identified as stemming from Bell’s song was that Rainey and Wildmon have altered their teaching styles in order to ensure they are not perceived as engaging in inappropriate conduct with female students.[41] However, the teachers’ alteration of their teaching styles in order to avoid accusations of sexual harassment does not constitute the material and substantial disruption of school work or discipline that would justify the restriction of student speech under Tinker.
Furthermore, even if we were to credit the School Board’s unsupported assertion that it indeed forecasted a disruption as a result of Bell’s song,[42] the summary-judgment 'evidence nevertheless shows that there are no facts that “might reasonably have led” the School Board to make such a forecast. Tinker, 393 U.S. at 514, 89 S.Ct. 733. The summary-judgment evidence conclusively shows that Bell’s song was composed, recorded, and posted to the Internet entirely off campus. School computers blocked Facebook and school policy prohibited possession of telephones, thus diminishing the likelihood that a student would access the song on campus. More *297 over, as discussed at greater length infra, the violent lyrics contained in Bell’s song were plainly rhetorical in nature, and could not reasonably be viewed as a genuine threat to the coaches, as underscored by the Disciplinary Committee’s own determination that whether Bell’s song constituted a threat was “vague.”
As we have emphasized, the facts simply do not support a conclusion that Bell’s song led to a substantial disruption of school operations or that school officials reasonably could have forecasted such a disruption. Nevertheless, in support of its argument that the School Board acted in accordance with Tinker, the dissent relies upon the School Board’s policy of classifying threats, harassment, and intimidation of teachers as a. “severe disruption.”[43] Under the dissent’s deferential view, certain categories of speech can be “inherently disruptive” within the meaning of Tinker so long as school officials categorize them as such by their own ipse dixit (such as the School Board’s “Severe Disruption” policy), thus rendering unnecessary any meaningful inquiry into whether the speech in fact did, or reasonably could, cause a substantial disruption as required by Tinker. Contrary to the dissent’s argument, the School Board cannot carry its burden of demonstrating a substantial disruption or a reasonable forecast of one simply by relying on its own policy or regulation. “The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures — Boards of Education not excepted.” Barnette, 319 U.S. at 637, 63 S.Ct. 1178. “The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards.” Goss, 419 U.S. at 574, 95 S.Ct. 729. Moreover, Tinker held that school officials cannot circumvent their burden of showing that a substantial disruption occurred, or can be reasonably forecasted, by simply adopting a policy that categorizes certain speech as a severe or substantial disruption without any reasonable factual predicate that such speech would likely lead to substantial disruption of school work or discipline. Tinker, 393 U.S. at 504, 511, 89 S.Ct. 733 (holding that school officials could not adopt and enforce policy prohibiting students from wearing armbands without a showing that such regulation was necessary to avoid material or substantial disruption); accord Shanley, 462 F.2d at 970 (“[T]he board cannot rely on ipse dixit to demonstrate the ‘material and substantial’ interference with school discipline. Put another way, Tinker requires that presumably protected conduct by high school students cannot be prohibited by the school unless there are ‘... facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.’ ”) (quoting Tinker, 393 U.S. at 514, 89 S.Ct. 733).
B.
The School Board alternatively and erroneously attempts to invoke this court’s decision in Ponce v. Socorro Independent School District, 508 F.3d 765 (5th Cir.2007), in arguing that Bell’s off-campus, but on-line, rap was not protected by the First Amendment. In Ponce, this court analogized to the Supreme Court’s decision *298 in Morse[44] and narrowly held that a student’s notebook which contained his plans to commit a coordinated “Columbine-style” shooting attack on his high school and other district schools was not protected by the First Amendment. Id. at 771 n. 2. Ponce involved particularly egregious facts: a student brought to campus a notebook containing numerous violent and disturbing descriptions of campus violence evocative of the school shootings that have taken place across the country in recent years. We explained that we were following the lead of the Supreme Court in Morse in holding that such speech is not protected because it poses a direct and demonstrable threat of violence unique to the school envirohment.[45] Specifically, we observed: “If school administrators are permitted to prohibit student speech that advocates illegal drug use because ‘illegal drug use presents a grave and in many ways unique threat to the physical safety of students,’ ... then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence, including massive deaths, to the school population as a whole.” Id. at 771-772 (quoting Morse, 551 U.S. at 425, 127 S.Ct. 2618).
Reading Justice Alito’s concurring opinion, in which Justice Kennedy joined, as controlling in Morse, we recognized that Morse holds only that “speech advocating a harm that is demonstrably grave and that derives that gravity from the ‘special danger’ to the physical safety of students arising from the school environment is unprotected.” Id. at 770. However, we observed that “because this is a content-based regulation, the [Alito] concurring opinion is at pains to point out that the reasoning of the court cannot be extended to other kinds of regulations of content, for permitting such content-based regulation is indeed at ‘the far reaches of what the First Amendment permits.’ ” Id. (quoting Morse, 551 U.S. at 425, 127 S.Ct. 2618 *299 (Alito, J., concurring)). As a result, we recognized, consistent with Justice Alito’s concurrence, that “Tinker’s focus on the result of speech rather than its content remains the prevailing norm.” Id.
Ponce therefore narrowly extends Morse in holding that the Tinker analysis does not apply to speech brought to campus that “gravely and uniquely threatens violence, including massive deaths, to the school population as a whole.” Id. at 772. At the same time, the Ponce opinion explicitly recognizes the continued applicability of the Tinker substantial-disruption test for most other types of on-campus speech. Id. at 770. Furthermore, Ponce also recognizes that, according to Justice Alito’s controlling concurring opinion, Morse does not expand schools’ authority to restrict on-campus speech on social or political matters. Id. at 769-70.
Applying these principles to the instant case, Bell’s song cannot be considered to fall within the narrow exception to Tinker recognized by this court in Ponce, thus depriving his speech of First Amendment protection. As an initial matter, Ponce did not involve student speech occurring entirely off-campus; rather, the student in Ponce brought his threatening diary to campus and showed its contents to a classmate. Id. at 766. More importantly, however, the Ponce decision explicitly pivoted on the particularized and unique threat of grave harm of mass school shootings posed by that student’s private writings. Id. at 771. Indeed, the student’s notebook graphically detailed the group’s “plan to commit a ‘[CJolumbine shooting’ attack” at the student’s school, as well as other area schools. Id. In holding such speech unprotected by the First Amendment, the court in Ponce emphasized that its decision was based on the fact that “the speech in question ... is not about violence aimed at specific persons, but of violence bearing the stamp of a well-known pattern of recent historic activity: mass, systematic school-shootings in the style that has become painfully familiar in the United States.” Id. at 770-71. In sharp contrast, Bell’s song contains violent imagery typical of the hyperbolic rap genre that is “aimed at specific persons,” rather than “bearing the stamp of ... mass, systematic school-shootings.” Id. Furthermore, the song amounts only to a rhetorical threat — not a genuine one — and does not come close to the catastrophic facts threatened in Ponce, which Judge Jolly emphasized were evocative of a “Columbine” or “Jonesboro”— style school attack. Id. at 771. Indeed, Bell testified that he did not intend to threaten the two coaches with his rap song; rather, the song was meant to be an artistic expression that reflected Bell’s real-life experiences and to raise awareness of an important issue of concern that he felt would be ignored by school officials.[46] Itawamba school officials’ own ac *300 tions demonstrate that they did not consider Bell’s song to portend violence by him personally, much less mass school shootings as dealt with in Ponce, 508 F.3d at 772. For example, the Disciplinary Committee could not even conclude whether Bell’s song constituted a definite threat to school officials, and there is no evidence that school officials ever contacted law enforcement regarding Bell’s song. In fact, after initially informing Bell that he was suspended pending the outcome of the disciplinary hearing, school officials did not require Bell to immediately vacate the school, and he remained in the school commons until his school bus arrived at day’s end. Moreover, any purported threat contained in Bell’s song was certainly a far cry from the “ ‘terroristic threat’ to the safety and security of the students and the campus” that the school officials encountered in Ponce. Id. at 767. We therefore refuse to broadly extend the holding of Ponce by concluding that Bell’s song is the equivalent of the extremely threatening notebook created and brought to school by the student in that case.
C.
The School Board’s additional argument that Bell’s rap song falls within the “true threat” exception to the First Amendment is likewise meritless. As explained infra, Bell’s rap was not a plainspoken threat delivered directly, privately, or seriously to the coaches but, rather, was a form of music or art broadcast in a public media to critique the coaches’ misconduct and also in furtherance of Bell’s musical ambitions. Moreover, Bell’s rap was not an unconditional threat that Bell himself would physically harm the coaches; at most, the song amounted to a conditional warning to them of possible harm from the female students’ family members if they continued to harass the young women. Finally, as evidenced by the reactions of the listeners themselves, there was no reasonable or objective ground for the coaches to fear that Bell personally would harm them.
The protections that the First Amendment affords speech and expressive conduct are not absolute. Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). The Supreme Court has long recognized that the government may regulate certain unprotected categories of expression consistent with the Constitution. See, e.g., Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). One such category of unprotected speech is that which constitutes a “true threat.” Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). “ ‘True threats’ encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.” Black, 538 U.S. at 359, 123 S.Ct. 1536 (citing Watts, 394 U.S. at 708, 89 S.Ct. 1399).
In Watts, the petitioner was convicted of violating a 1917 statute which prohibits a person from “knowingly and willfully” making “any threat to take the life of or to inflict bodily harm upon the President of the United States.” Id. (citing 18 U.S.C. § 871(a)). As the Watts Court explained:
The incident which led to petitioner’s arrest occurred on August 27, 1966, during a public rally on the Washington Monument grounds. The crowd present broke up into small discussion groups and petitioner joined a gathering scheduled to discuss police brutality. Most of those in the group were quite young, either in their teens or early twenties. *301 Petitioner, who himself was 18 years old, entered into the discussion after one member of the group suggested that the young people present should get more education before expressing their views. According to an investigator for the Army Counter Intelligence Corps who was present, petitioner responded: ‘They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. ’ ‘They are not going to make me kill my black brothers.’ On the basis of this statement, the jury found that petitioner had committed a felony by knowingly and willfully threatening the President.
Id. at 705-06, 89 S.Ct. 1399 (emphasis added).
On petition for writ of certiorari, the Supreme Court reversed, observing that “whatever the ‘willfullness’ requirement [of the statute] implies, the statute initially requires the Government to prove a true ‘threat.’ ” Id. at 708, 89 S.Ct. 1399. The Court held that the “kind of political hyperbole” deployed by the petitioner could not qualify as a “true threat” in light of the “ ‘profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideo-pen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.’” Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). In this regard, the Court observed that “[t]he language of the political arena, like the language used in labor disputes ... is often vituperative, abusive, and inexact.” Id. (citing Linn v. United Plant Guard Workers of America, 383 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)). The Court concluded: “We agree with petitioner that his only offense here was ‘a kind of very crude offensive method of stating a political opposition to the President.’ Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.” Id.
Applying the factors identified as instructive by the Court in Watts — i.e., the context and manner of the speech, its conditional nature, and the listeners’ reactions, it is clear that the rap song that Bell recorded in a professional studio and subsequently posted on the Internet in protest of what he perceived as an injustice occurring at his high school did not constitute a “true threat.”
First, with regard to context, it is important to consider — albeit not ultimately dis-positive — that the- purported “threats” were contained in a rap song, a musical genre that, like other art forms, has its own unique artistic conventions.[47] See Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists, 290 F.3d 1058, 1078 (9th Cir.2002) (“Indeed, context is critical in a true threats case and history can give meaning to the medium.”). For example, hyperbolic and violent language is a commonly used narrative device in rap, which functions to convey emotion and meaning-not to make real threats of violence. See, e.g., Andrea L. Dennis, Poetic (In) Justice ? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 22 (2007) (“Metaphor plays a critical role in rap *302 music lyrics.... In rap music, metaphors not only express hope and positivity but also ‘despair, stagnation, or destruction.’ ”) (internal citation omitted). Of course, the use of violent rhetorical imagery in music is not exclusive to rap. Presumably, neither the School Board nor the dissent would believe that Johnny Cash literally “shot a man ... just to watch him die.” Nor would they likely conclude that the Dixie Chicks’ hit song “Goodbye Earl” described the artists’ own literal pre-meditat-ed murder of a man using poisonous black-eyed peas, or that Bob Marley “shot the sheriff’ but spared the deputy’s life. Indeed, as songwriters of every genre, rap artists live through invented characters and explore roles and narrative voices, both on and offstage.[48] In addition, the context-related evidence demonstrates that Bell, as an aspiring rap musician who has been writing and recording music since his early teens, publicized the song not only in an effort to raise awareness of the coaches’ misconduct but also to attract the attention of record labels and potential fans.
Equally important to the context of Bell’s rap is the fact that it was broadcast publicly over the Internet and not conveyed privately or directly to the coaches. Courts have recognized that statements communicated directly to the target are much more likely to constitute true threats than those, as here, communicated as part of a public protest.[49] Compare Watts, 394 U.S. at 705-06, 89 S.Ct. 1399 with United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir.1996). The case law shows that “it makes a big difference” whether the purportedly threatening speech is “contained in a private communication — a face-to-face confrontation, a telephone call, a dead fish wrapped in newspaper — or is made during the course of public discourse. The reason for this distinction is obvious: Private speech is aimed only at its target. Public speech, by contrast, seeks to move public opinion and to encourage those of like mind.” Planned Parenthood of Columbia/Willamette, Inc., 290 F.3d at 1099 (9th Cir.2002) (Kozinski, J. dissenting). Indeed, as the Sixth Circuit recently observed, such contextual cues are vital in assessing whether a reasonable listener would consider a statement a serious expression of an intent to cause harm: “A reasonable listener understands that a gangster growling ‘I’d like to sew your mouth shut’ to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words *303 Til tear your head off mean something different when uttered by a professional football player from when uttered by a serial killer.” United States v. Jeffries, 692 F.3d 473, 480 (6th Cir.2012). Moreover, the Supreme Court has cautioned that courts should be careful to keep in mind the “public” nature of purportedly threatening speech in assessing whether it falls outside the protections of the First Amendment. See, e.g., N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 926-27, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (“Since respondents would impose liability on the basis of a public address-which predominantly contained highly charged political rhetoric lying at the core of the First Amendment — we approach this suggested basis of liability with caution.”).
Likewise, in the instant case, the overall context reveals that a reasonable listener would be able to distinguish genuine threats of perpetrating school violence, like those in Ponce, from the purely rhetorical use of violent language contained in the lyrics of an aspiring rap musician who publicly broadcast his song, rather than privately communicated it, in an effort to (i) raise awareness of an important issue of public concern, and (ii) attract the attention of listeners and record labels in furtherance of his musical ambitions.
Second, the purported “threats” contained in the song are conditional in nature, as demonstrated by both the lyrics themselves and the school officials’ interpretation of them. The language referencing “capping” Wildmon is conditional by its very terms: “Middle fingers up if you want to cap that nigga” (emphasis added). Moreover, one of the Disciplinary Committee members agreed with Bell that the song’s lyrics regarding putting a pistol down someone’s mouth conveyed that “if [the teachers] don’t stop what they’re doing then a parent kinda is gonna do that, not really him [ie., Bell].”
Third and finally, the reactions of the listeners themselves undermine the notion that a reasonable listener would view the song as a threat. For example, the Face-book, screen shot indicates that Bell’s Fa-cebook “friends” who commented on the song did not view it as a threat by Bell against the coaches but rather as the product of Bell’s artistic aspirations {e.g., “Hey, don’t forget me when you’re famous” and “Lol ... Mane Im tellin you cuz ... been tellin you since we was little ... keep fuckin with it man you got all the talent in the world ... ”). Moreover, the Disciplinary Committee could not even conclude whether Bell’s song constituted a definitive threat, instead finding the issue “vague,” and Coach Rainey himself testified that he viewed the song as “just a rap” rather than an actual threat. Even Coach Wild-mon, who testified that he took the song “literally” and felt “scared,” did not indicate whether he actually feared Bell, rather than the possibility that one of the female students’ family members might harm him in light of the song’s revelations.
As the foregoing demonstrates, the overall factual context reveals that neither the coaches, nor school officials, could have reasonably interpreted Bell’s song as a serious expression of an intent to cause harm. Rather, we conclude that the violent language contained in the lyrics was clearly rhetorical in nature, and we therefore reject the argument that Bell’s song constituted a “true threat” of violence.[50]
*304 IV.
In conclusion, we do not decide whether the Tinker “substantial-disruption” test can be applied to a student’s rap song that he composed, recorded and posted on the Internet while he was off campus during non-school hours. Rather, we decide only that, even assuming arguendo the School Board could invoke Tinker in this case, it would not afford the School Board a defense for its violation of Bell’s First Amendment rights because the evidence does not support a finding, as would be required by Tinker, that Bell’s song either substantially disrupted the school’s work or discipline or that the school officials reasonably could have forecasted such a disruption. With respect to the School Board’s alternative argument, we conclude that Bell’s song did not “gravely and uniquely threaten violence” to the school population such to justify discipline pursuant to this court’s narrow holding in Ponce that student speech that threatened a Columbine-style attack on a school was not protected by the First Amendment. We also conclude that Bell’s speech did not constitute a “true threat,” as evidenced by, inter alia, its public broadcast as a rap song, its conditional nature, and the reactions of its listeners.
For these reasons, the district court’s judgment is REVERSED IN PART, and judgment is RENDERED in favor of Taylor Bell against the School Board on his First Amendment claim. The case is REMANDED, and the district court is DIRECTED to award Bell nominal damages, court costs, appropriate attorneys’ fees, *305 and an injunction ordering the School Board to expunge all references to the incident at issue from Bell’s school records. In all other respects, the judgment of the district court is AFFIRMED IN PART.

. The Bells waived their appeal of the district court’s ruling on Dora Bell’s Fourteenth Amendment substantive-due-process claim by failing to raise that issue in their initial brief. We therefore affirm the district court’s ruling without addressing the merits of that claim. For the same reason, we affirm the district court’s alternative holding that qualified immunity bars Taylor Bell's suit against the individual defendants. Therefore, we consider only Taylor Bell’s First Amendment claim against the School Board.

. "Rap has been defined as a 'style of black American popular music consisting of improvised rhymes performed to a rhythmic accompaniment.’ ” Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 572, n. 1, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting The Norton/Grove Concise Encyclopedia of Music 613 (1988)). According to scholars, the genre "derives from oral and literary traditions of the Black community." Andrea L. Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 22 (2007). Today, rap music is not only a musical form with its own unique artistic conventions, id. at 20, but also a mul-ti-billion-dollar commercial industry. See, e.g., Julie Watson, Rapper’s Delight: A Billion-Dollar Industry, Forbes.com (Feb. 18, 2004), http://www.forbes.eom/2004/02/l 8/cx_ jw_0218hiphop.html

. Bell testified that he regularly records music in a studio ("once a week” if possible).

. As the students are not parties to this suit and were minors at the time these events took place, we use only their initials to protect their privacy.

. Bell’s Facebook page labels the song "P.S. Koaches,” but Bell's complaint identifies the song’s title as "PSK The Truth Needs to be Told.”

.The record contains an audio recording of the song lyrics and three different transcripts of the recording: (1) a transcript submitted by the School Board in its response to Bell’s preliminary-injunction motion, (2) a transcript submitted by Bell at the preliminary-injunction hearing, and (3) a transcript submitted by the School Board at the preliminary-injunction hearing. Where appropriate, spelling and typography are standardized and the lyrics are harmonized as between the re *284 corded and transcribed versions of the song entered into the district court record. Where the lyrics differ between the three different transcriptions in the record, the differences are noted. However, none of the lyrical differences is dispositive to the outcome of this case.

. Or "turnin’ to a fucking mess.”

. Or "daw-city.”

. Or "So the union league is gone [sic ] hurt.”

. Or "as bad as hell.”

. 1 Or "try your mama beat crews up.”

. “T-Bizzle” refers to Taylor Bell.

. Or "ruler.” The transcript of the lyrics submitted by Bell at the preliminary-injunction hearing specifies the lyric is "rueger.” However, as noted supra, our holding does not pivot on the applicability of one term or the other.

. Or "You so lame it's a damn shame/instead you wadn't shit, the whle team gotta reign Mother Fucker.”

. Or "kissing.”

. "Number 25” refers to one of the female students.

. Or “boww” according to the transcript of lyrics provided by Bell at the preliminary injunction hearing.

. "[0]h my God.”

. Or "cause you pimpin can’t read.”

. Bell testified at the preliminary-injunction hearing that he posted the song "on the first Wednesday in January,” which would be January 5, but Bell's brief in support of his preliminary-injunction motion states that the song was posted on January 3.

. Although a screen shot of Bell's Facebook page contained in the record indicates he had approximately 1,380 “friends,” there is no evidence of how many of his "friends” were current students at Itawamba. In addition, the evidence does not reflect how many "friends” listened to the song. The dissent argues that three of the "friends” shown in a screen shot of Bell’s Facebook page were Bell’s "fellow students.” However, at most, the screen shot shows only that three "friends” were a part of the Itawamba Agricultural High School network, and does not evince whether those individuals were students currently enrolled at the high school, former students who had graduated or transferred but remained on the network, or individuals who were part of the Itawam-ba network for some other reason. Although comments directly below Bell’s Facebook posting indicate that some individuals listened to the song, there is no evidence whether those individuals were fellow students. Moreover, as discussed at greater length infra, an examination of those Face-book comments {e.g., "Hey, don't forget me when you're famous” and “Lol ... Mane Im tellin you cuz ... been tellin you since we was little ... keep fuckin with it man you got all the talent in the world ... ”) and Bell’s response to them {e.g., "thanks mane ... I JUST NEED A BIG BREAK THROUGH ... no wut I mean? ?”) undermines the dissent’s contention that the song was viewed or reasonably could have been viewed as a genuine threat of violence by Bell against the coaches rather than the artistic expression of an aspiring rap musician seeking fame and fortune.

. He explained that the version initially posted to Facebook had been a "raw” and "unfinished” copy of the song.

. The record lacks details about the precise contents of the slideshow.

.Bell explained that “4:30” means “it's over” or "I’m leaving.”

. During the hearing, Bell’s counsel requested information about the initial decision by school officials to suspend Bell and what the basis for that decision had been. Floyd responded that those issues were not the purpose of the hearing, explaining again that the hearing's purpose was to determine if Bell had harassed, intimidated, or threatened teachers through his off-campus posting of his song on the Internet. In addition, when Bell’s attorney sought to bring attention to affidavits from the female students corroborating the song’s accusations, Floyd stated that the Committee would not consider at the proceeding the truth or merits of the female students' allegations that the coaches sexually harassed them.

, His testimony was unclear whether he meant that school officials failed to respond to student complaints generally or to complaints specifically concerning the allegations made in the song.

. The dissent concludes that Bell's statement that he was writing about real-experiences is an indication that Bell’s rap was not rhetorical but instead constituted a real threat of violence. To the contrary, when Bell stated that he was writing about real-life experiences, he was referring to the real-life experience of male high school coaches sexually harassing female students.

. Specifically, Bell stated: ”1 didn’t say that I was going to do that.... I’m from the country. And you know, I know how people are.... Eventually ... somebody's parents ... or their brother ... or their big sister or somebody might get word ... I was just foreshadowing something that might happen.... I wasn’t saying that I was going to do that.” One of the Committee members indicated that she agreed with Bell, stating "... it sound like to me you were saying that if they don’t stop what they’re doing then a parent kinda is gonna do that, not really him [indicating Bell].”

.The dissent is mistaken in asserting that one member of the Committee "explain[ed] there would have been no problem with the rap recording or its vulgar language if it had not included threats against school employees.” It is true that one Committee member indicated that Bell should not have "put names” in the rap (noting that she does not use real names when she writes poetry), from which the dissent apparently derives its misinterpretation. However, that member subsequently admonished Bell to use "big words, not bad words” in his raps and to "censor that stuff,” thus providing Bell poetic or artistic advice. That Committee member did not characterize the statements in Bell’s rap as threatening.

. Specifically, the letter stated: "Based on the testimony given at the due process hearing on January 26, 2011, the Discipline Committee determined that the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague; however, they determined that the publication of those lyrics did constitute harassment and intimidation of two school district teachers, which is a violation of School Board Policy and state law.” The proceedings before the Committee were audio-recorded but were not transcribed; only a sound recording of it is in the record.

. The School District’s "Discipline-Administrative Policy” prohibits "[hjarassment, intimidation, or threatening other students and/or teachers.”

.Specifically, Floyd’s letter stated: "As you are aware, on February 7, 2011, the Itawam-ba County Board of Education determined that Taylor Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law. As a result, the recommendations of the disciplinary hearing were upheld by the Board of Education.” The Board did not cite the state law to which it referred; nor has it done so in its litigation documents. Floyd's letter does not explain the difference between the Committee's finding that the issue of whether Bell’s lyrics constituted a threat was "vague” and the School Board's finding that Bell had “threatened, intimidated,, and harassed” the teachers. The record is unclear regarding the exact evidence presented to the School Board. Based on the testimony of school officials at the preliminary-injunction hearing, the Board’s decision apparently was based on the same audio-recording of Bell's song heard by the Disciplinary Committee.

. The complaint also alleged that defendants violated Dora Bell’s Fourteenth Amendment substantive-due-process right to control her child’s upbringing. As noted supra, the district court granted summary judgment for the defendants on this claim, and the Bells have not appealed that determination.

. For example, Wildmon stated: "I tried to make sure, you know, if I’m teaching, and if I’m scanning the classroom, that I don’t look in one area too long. I don't want to be accused of, you know, staring at a girl or anything of that matter.”

. "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.” Id. at 509, 89 S.Ct. 733 (citing Burnside, 363 F.2d at 749).

. The district court erroneously concluded that "the U.S. Supreme Court in Tinker specifically ruled that off-campus conduct causing material or substantial disruption at school can be regulated by the school.” See Bell, 859 F.Supp.2d at 837-38.

. The dissent erroneously contends that "technological developments,” especially the Internet, have "rendered the distinction [between on- and off-campus speech] obsolete.” Although we certainly acknowledge that the Internet has yielded previously uncontemplat- *294 ed factual scenarios that pose difficult questions, it is not our place to anticipate that the Supreme Court will hold that the Internet has vitiated the distinction between on- and off-campus student speech, thus expanding the authority of school officials to regulate a student’s speech when he or she is at home during non-school hours. Accord Morse, 551 U.S. at 424, 127 S.Ct. 2618 (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority— including their authority to determine what their children may say and hear — to public school authorities.”); Shanley, 462 F.2d at 964 ("It should have come as a shock to the parents of five high school seniors ... that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's rights of expressing their thoughts. We trust that it will come as no shock whatsoever to the school board that their assumption of authority is an unconstitutional usurpation of the First Amendment.”). Further, it is especially inappropriate for us to pronounce such a consequential rule in the present case, where the evidence does not support a conclusion that the speech has caused, or reasonably could have been forecasted to cause, a substantial disruption of the school's work or discipline.

. A number of circuit courts have dealt with the question of Tinker’s reach beyond the schoolyard. The Second, Fourth, and Eighth Circuits have concluded that Tinier applies to off-campus speech in certain circumstances. See, e.g., Doninger v. Niehoff, 527 F.3d 41 (2d Cir.2008) (student disqualified from running for class secretary after posting a vulgar and misleading message about the supposed cancellation of an upcoming school event on a web log from home); Kowalski v. Berkeley County Schs., 652 F.3d 565 (4th Cir.2011) (student suspended for creating and posting to a MySpace webpage that was largely dedicated to ridiculing a fellow student); S.J.W. v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771 (8th Cir.2012) (students suspended for creating website with offensive and racist comments discussing fights at their school and mocking black students, as well as sexually explicit and degrading comments about particular female classmates). These circuits have imposed their own unique threshold tests before applying Tinker to speech that originates off campus. For example, the Eighth Circuit requires that it be "reasonably foreseeable that the speech will reach the school community,” S.J.W., 696 F.3d at 777, while the Fourth Circuit requires that the speech have a sufficient "nexus” to the school. Kowalski, 652 F.3d at 573.
This court, along with the Third Circuit, has left open the question of whether the Tinker "substantial-disruption” test can apply to off-campus speech. In J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 926, 930 (3d Cir.2011) (en banc), the Third Circuit assumed, without deciding, that Tinker applied to a student's creation of a parody MySpace profile mocking the school principal, but held that it was not reasonably foreseeable that the speech would create a substantial disruption. In a separate concurrence, five judges expressed their position that Tinker does not apply to off-campus speech and that "the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large.” Id. at 936 (Smith, C.J., concurring). In another Third Circuit en banc case decided the same day as Snyder, and also involving a principal parody profile, the school district did "not dispute the district court's finding that its punishment of [the student] was not appropriate under Tinker.” Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 216 (3d Cir.2011) (en banc). The school district relied instead on Fraser. Id. But the court went on to note that Fraser did not allow the school "to punish [the student] for expressive conduct which occurred outside of the school context.” Id. at 219. In Porter v. Ascension Parish School Board, this court similarly left open the question of whether Tinker applied to off-campus student speech. 393 F.3d 608, 615-16 n. 22 (5th Cir.2004) (student's sketch depicting violent siege on school was speech protected by the First Amendment and not "on-campus” speech subject to school regulation, where student had completed drawing in his home, stored it for two years, and never intended to bring it *295 to campus, but rather stored it in closet where it remained until, by chance, it was unknowingly taken to school by his brother; but principal was not objectively unreasonable and therefore entitled to qualified immunity and plaintiff's claim against school officials in their official capacity was waived because plaintiff failed to brief the issue).

. The dissent erroneously contends that this court’s decisions in Sullivan v. Houston Independent School District, 475 F.2d 1071 (5th Cir.1973), and Porter v. Ascension Parish School Board, 393 F.3d 608, 615-16 n. 22 (5th Cir.2004), hold that Tinker applies to off-campus speech, such as Bell’s. This is a patent misreading of those decisions. In Sullivan, the court did not apply the Tinker substantial-disruption test to assess whether school officials violated the First Amendment. The Sullivan court recognized that there is nothing per se unreasonable about requiring a high school student to submit written material to school authorities prior to distribution on campus or resulting in a presence on campus, and that it could not be seriously urged that the school's prior submission rule is unconstitutionally vague or overbroad. 475 F.2d at 1076 (citing Shanley, 462 F.2d at 960; Pervis v. LaMarque Independent Sch. Dist., 466 F.2d 1054 (5th Cir.1972)). Instead, the court held that the school principal had disciplined a student for failure to comply with the school's rules requiring prior submission to the school principal of all publications, not sponsored by the school, which were to be distributed on the campus or off campus in a manner calculated to result in their presence on the campus. Id. The student was disciplined for twice selling newspapers at the entrance of the school campus, to persons entering therein, without making prior submission of the papers, and for using profanity towards the principal ("the common Anglo-Saxon vulgarism for sexual intercourse”) and in the presence of the principal’s assistants (specifically, "I don't want to go to this goddamn school anyway”). Id. at 1074. Thus, notwithstanding the Sullivan court’s references to Tinker in that decision, that opinion did not apply the Tinker substantial-disruption test to off-campus speech.
This court in Porter did not hold that the Tinker substantial-disruption test applies to off-campus speech. 393 F.3d at 615 n. 22. The court concluded that the speech involved in Porter-viz'., a drawing depicting school violence that was inadvertently taken to campus by the student’s brother — constituted off-campus speech for which the Tinker substantial-disruption test did not apply. Id. at 615. The court found that the circumstances involved in Porter were "outside the scope” of those involved in other non-Fifth Circuit cases which have held that in certain situations off-campus speech that is later brought on campus may be subject to the Tinker substantial-disruption analysis. Id. at 615 n. 22. In dicta, the court acknowledged those other cases applying Tinker to certain categories of off-campus speech and noted that its "analysis today is not in conflict with this body of case law.” Id. However, given the facts before it, the Porter court was not in a position to decide whether, and under what circumstances, Tinker applied to off-campus speech.
Thus, contrary to the dissent's assertion, the applicability of the Tinker substantial-disruption test to off-campus speech like Bell's remains an open question in this circuit. However, as explained herein, we need not resolve that consequential question because the School Board did not demonstrate that Bell's song caused or reasonably could have caused a substantial disruption. In so doing, we are guided by the " 'older, wiser judicial counsel not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' ” Pearson v. Callahan, 555 U.S. 223, 241, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Scott v. Harris, 550 U.S. 372, 388, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (Breyer, J., concurring); Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)); see also Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.”).

. Defendants point to Ramey’s claim that "since the song came out, students have started to mingle [in the gym]” as evidence of a substantial disruption. However, there is no evidence that the student’s mingling was improper or anything but a coincidence, nor is there evidence that such student "mingling” could reasonably be considered a substantial or material disruption.

. At the preliminary-injunction hearing on March 10, 2011, Superintendent McNeece, when asked directly if she was aware of any disruption, could point only to the evidence that teachers had altered their teaching style in response to Bell’s song, which both Wild-mon and Rainey explained was an effort to avoid any appearance of impropriety with students. As explained herein, teachers’ efforts to avoid the appearance of such improprieties does not constitute a "substantial disruption” of school work or discipline under the Tinker standard.

.Although it may not be dispositive, we observe that none of the school personnel even mentioned the term "disruption” at the January 26, 2011 Disciplinary Committee hearing; and there is no evidence reflecting that the School Board in its ruling on February 7, 2011 found that a disruption occurred or reasonably could have been forecasted as a result of Bell’s song.

. This policy lists sixteen different "offenses” under the heading "Severe Disruptions.”, We note that, by its very terms, the other "offenses” qualifying as "severe disruptions” under this policy suggest that the policy relates to on-campus conduct (e.g., "running in the hall,” “unnecessary noise in the hall,” "gambling or possession of gambling devices at school”), not to off-campus conduct, like Bell's.

. In Morse, a high school student unfurled a 14-foot banner bearing the phrase "BONG HiTS 4 JESUS” during a school-sanctioned and supervised event. 551 U.S. at 397, 127 S.Ct. 2618. The principal confiscated the banner and suspended the student. Id. at 398, 127 S.Ct. 2618. The student filed suit under 42 U.S.C. § 1983 against the principal and the School Board, claiming that the principal's actions violated his First Amendment rights. Id. at 399, 127 S.Ct. 2618.
The Morse decision resulted in a narrow holding: a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school “reasonably view[s] as promoting illegal drug use.” Id. at 408, 127 S.Ct. 2618. Indeed, Justice Alito’s concurrence stated that he joined the majority opinion "on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue.” Id. at 422, 127 S.Ct. 2618 (Alito, J., with whom Justice Kennedy joins, concurring). Justice Alito also made clear that he joined the majority only insofar as "the opinion does not hold that the special characteristics -of the public schools necessarily justify any other speech restrictions” beyond those articulated in the Supreme Court’s prior student speech cases. Id. at 423, 127 S.Ct. 2618. As made strikingly clear by Justice Alito’s concurrence, Morse therefore in no way expands school officials’ authority to restrict student speech on social or political matters; rather, the decision held only that schools have the limited authority to restrict speech at school or a school-approved event that could be reasonably viewed as promoting illegal drug use.

. The court observed: “Such shootings exhibit the character that the concurring opinion [in Morse ] identifies as particular to schools.... This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and perhaps even less forewarning.”

. We note that Bell's rap song is speech on a matter of public concern. Speech involves matters of public concern “when it can 'be fairly considered as relating to apy matter of political, social, or other concern to the community,’ or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public’ ” Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011) (citation omitted). The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.” Id. (citation omitted). Superintendent McNeece’s own testimony at the preliminary injunction hearing explicitly confirmed that the subject matter of Bell’s song — male coaches' improper conduct towards female students — would be of “public importance.” We need not address the district court's disparagement of student speech on matters of public concern, as compared to adult speech on matters of public concern, Bell, 859 F.Supp.2d at 841, because that was part of that court's erroneous interpretation *300 and application of Tinker which we reject herein.

. See Andrea L. Dennis, Poetic (Injustice ? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 20 (2007).

. In this regard, contrary to the dissent's argument, Bell’s statement that his song reflected ‘'real-life" experience, does not mean his lyrics are all literally true, rather than, in part, rhetorical and creative.

. In Porter, this circuit cited Doe v. Pulaski County Special School District, 306 F.3d 616 (8th Cir.2002), in analyzing the threshold issue of the “true threat” analysis, namely: whether the purported threat was “intentionally or knowingly communicated to either the object of the threat or a third person.” 393 F.3d at 616-17. In Doe, the Eighth Circuit also listed five non-exhaustive factors relevant to the issue of how a reasonable person would receive an alleged threat. 306 F.3d at 623. One of those factors was “whether the person who made the alleged threat communicated it directly to the object of the threat.” Id. The Eighth Circuit also considered the reactions of those who heard the threat, whether the threat was conditional, whether the speaker had a history of making threats against the object of the threat, and whether the object of the threat had reason to believe that the speaker had a violent tendency. Id. We observe that all of these factors weigh in favor of the conclusion that Bell’s song was not a “true threat.” For example, as explained infra, the warning in Bell’s song was clearly conditional in nature, and there was no evidence Bell had violent tendencies or had ever threatened the coaches.

. Perhaps correctly realizing that the School Board cannot overcome the high hurdle of showing Bell’s song constituted a "true threat," the dissent seeks to talismanically invoke the tragic history of mass school shootings in an effort to shield the School Board’s actions from any modicum of constitutional scrutiny. We reject the dissent’s overly defer *304 ential approach. Although the history of violence in schools may be a pertinent consideration in determining whether school officials acted reasonably, school officials cannot simply shirk constitutional dictates by pointing to a school tragedy each time a student sings, writes, or. otherwise uses violent words or imagery outside of school.
Moreover, while conceding that Bell’s song addresses a matter of public concern, the dissent does not give due consideration to the consequences on social and political discourse of reflexively deeming Bell's song a “true threat.” The genius of the First Amendment is its implicit recognition that the great diversity of our democracy yields a corresponding diversity in the creative forms of social and political debate. See, e.g., Brown v. Entertainment Merchants Ass’n,-U.S.-, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (“Under our Constitution, esthetic and moral judgments about art and literature ... are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.”) (internal quotation and citation omitted); Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (observing that “one man’s vulgarity is another’s lyric”). A cartoon can be as powerful as a pamphlet. See Hustler Magazine v. Falwell, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); accord Brown, 131 S.Ct. at 2733 (“Like the protected books, plays, and movies that preceded them, video games communicate ideas — and even social messages — through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world).”). The most vulgar and hateful of words can be the only ones capable of conveying one’s ideology. See Snyder, 131 S.Ct. at 1216-17. Within this same tradition, Bell accomplished his social critique of the coaches' harassment of female students by including vulgar and violent language in his off-campus rap recording. Compare Watts, 394 U.S. at 708, 89 S.Ct. 1399 (“The language of the political arena, like the language used in labor disputes ... is often vituperative, abusive, and inexact.”). While some may prefer a socio-political landscape lacking such rhetoric, the First Amendment nevertheless protects it, and the narrow applicability of the “true threat” doctrine ensures that speech on such matters of public concern, even if vulgar or violent, is not chilled. See id. at 706, 89 S.Ct. 1399 (holding that petitioner’s statement at a public rally that, if drafted and given a rifle, he would shoot the President was political hyperbole and not a "true threat” and was, therefore, protected by the First Amendment).